## Frasure v. Commonwealth.

(Decided April 25, 1916.)

### Appeal from Carter Circuit Court.

1. Criminal Law—Selection of Jury—Summoning From Adjoining County.—Where there is no widespread prejudice shown to exist against the defendant in the county where the crime was committed and a qualified jury was easily obtained from a special venire of fifty men summoned from the county, the court was not authorized under section 194 of the Criminal Code of Practice, on motion of the defendant, to summon a jury from an adjoining county as it was not shown that it was impracticable to obtain an impartial jury from the county in the manner required by the section.

2. Criminal Law—Witnesses.—It was prejudicial error for the court to permit a witness to testify to the jury as to the contents of a supposed letter which the Commonwealth claimed had been written by the defendant to the witness, when the witness is unable to state that the letter was written by the defendant, or by whom it was signed, and when he himself did not read the letter but it had been read to him by his wife.

3. Criminal Law—Instructions.—When in a murder case, the evidence is entirely circumstantial and there is no testimony by any eyewitness to the crime, it is the duty of the court to instruct the jury as to the law of manslaughter and self-defense as well as that of murder. But when the defendant testifies and shows how the homicide occurred, which was that it was committed by persons who attacked him and the murdered person for the purpose of robbery, and that there was no altercation or combat between himself and the deceased, there no longer exists any reason for instructions upon manslaughter or self-defense, and the court un-

der such circumstances was not required to so instruct the jury in order to submit to them the whole law of the case.

W. S. HARKINS, G. W. WOLFORD, FRANK PRATER, CAL- HOUN WILHOIT and C. MORFORD for appellant.

JOHN M. WAUGH, M. M. LOGAN, Attorney General, and OVER- TON S. HOGAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The grand jury of Carter County on the 26th day of May, 1915, returned against appellant, Robert Fras- ure, an indictment charging him with wilfully murder- ing in that county, Stella Kinney, on the 2nd day of May, preceding the indictment. His case was set for trial at that term of the court and on the 7th day of June. A trial at that time resulted in a hung jury, and a second trial was had at the following October term of the court, resulting in appellant being convicted by the verdict of the jury and his punishment fixed at confine- ment in the penitentiary for his natural life. His mo- tion for a new trial having been overruled he prosecutes this appeal, assigning numerous errors for a reversal of the judgment.

The ones urged before us may be stated as follows: (1) Error of the court in failing to order a jury sum- moned from another county adjoining Carter County; (2) the court should have peremptorily instructed the jury to find the defendant not guilty; (3) failure of the court to give to the jury the whole law of the case, and (4) error of the trial court in admitting before the jury prejudicial and incompetent testimony offered by the Commonwealth.

Before considering any of these objections and to assist in an understanding of them when considered, it is necessary that we should make as brief a statement as possible of the facts.

The appellant at the time resided in Fleming County and was engaged in operating a country store about one mile and a half from a station in that county called Ewing. His brother-in-law and the father of the de- ceased, Stella Kinney, lived some four or five miles east of Olive Hill, in Carter County, the distance between these two points being something between fifty-five and sixty miles. The murdered girl had been staying at the home of appellant for something near ten months

immediately preceding the tragedy resulting in her death and which occurred about one or one and a half miles west of Olive Hill in Carter County. The appellant is a married man, 34 years of age, his family consisting of a wife and some two or three children. Mrs. Frasure was in delicate health and in an advanced stage of pregnancy at the time, and the niece of appellant had been engaged in discharging necessary household duties throughout her ten months' stay at his house, or at any rate for quite a while preceding the first day of May, 1915. She was a robust girl, being just past 17 years of age and weighing about 125 pounds. The proof shows that she was somewhat retired and timid in her disposition and did not participate in the usual festivities of young people as do most girls of her age, and that she had comparatively few, if any, young men visitors who paid her attentions, and that she did not seem to court or encourage such, but nevertheless, a very industrious, sensible and good girl. Some few days before May 1st, appellant received a letter from the father of the girl stating in substance that her mother's health had become bad and that they needed her at home to assist in performing the duties necessary to housekeeping, and at about four o'clock on the morning of May 2, the appellant started with his niece through the country to take her to her father's. They traveled in a no-top buggy drawn by one horse, it being rather under size, and a great portion of the road being rough and hilly. Neither the appellant nor his niece was acquainted with the road necessary for the journey, especially so with the greater portion of it. This necessitated frequent stopping to inquire the route that should be pursued, but notwithstanding these precautions the way would sometimes be missed. Frequently they stopped and rested; at one time ate a lunch which they had prepared and carried along. The horse became exceedingly fatigued and could not be made to travel except in a slow walk. When within between six or eight miles of Olive Hill one of these stops was made and a rest of about one hour and fifteen minutes was taken. At the close of this rest, which was about 3:15 P. M., the journey was pursued. At the place where the road leaves what is stated by the witnesses to be the "north Fork of Holley" several roads seem to converge, and although the appellant had been given directions he seems, after

passing this point and traveling something near a mile and a half, to have concluded that he was upon the wrong road, and he turned around and went back to the point where the road converged, taking another one and traveling about the same distance, when he arrived at the same conclusion and again returned to the starting point and pursued his journey over the first road that he had taken which he had from some cause concluded was the right one. Just beyond this is Garvin Ridge and the hill is known as "Clark's hill." About this time it began raining and as the travelers were going down Clark's hill, it is claimed by appellant that two persons appeared from the side of the road, one taking hold of the bits of his horse and the other taking a position at the rear of the buggy. The latter one at the time saying, in substance, "Where is your whiskey?" or "Give up your whiskey." He about this time concluded that he was about to be robbed by these men and made an effort to get out of the buggy, but before he got upon the ground he was struck upon the head by the man at the rear of the buggy with a club, which for a brief time rendered him partially insensible, but he had sufficient mind to realize that his niece was making some outcry and he heard two licks which he supposed was applied to some part of her body. By this time he had sufficiently recovered to straighten up and he engaged in a scuffle with his assailant and in this he was thrown against a nearby barb-wire fence, resulting in the gashing of the back of one of his hands. This scuffle finally resulted in his antagonist throwing him down and extracting from him his purse containing $25.00 in cash and a check issued to him by a Mr. Jackson, of Ewing, for the sum of $32.97. That about this time he discovered that his buggy was moving off down the road with one man in it, presumably the one who had robbed him, and he saw another jump in the buggy, which was presumably the one that took hold of the bridle-bits of the horse, and they in this manner disappeared down the road. It might be here necessary to state that the appellant was a cripple, having for many years suffered from white swelling, and one of his legs was about four inches shorter than the other, the usefulness of this afflicted leg being very much impaired. After the combat and observing the departure of the buggy under the circumstances stated, he was unable to walk without the

use of his stick, which he says was carried away in the buggy, but he crawled on his hands and knees down the road for a distance of about 53 yards and he there found his niece lying just at the edge of the road covered in mud as well as blood. He crawled up to her and took the raincoat, which she had thrown over her head to protect her hat as well as her body, and placed it under her head, and then commenced to raise an alarm which resulted, after about thirty minutes, in the arrival of a Mr. Binion and a lady who came with him. These parties say that it was then, and had been raining and had turned quite cold. That they heard the distress signals of appellant for twenty or thirty minutes before they went there, having concluded that it was some person who was intoxicated and for this reason did not get to the scene sooner. The appellant told them the facts as to the tragedy substantially as we have stated, and they found him lying within six or eight feet of the girl and he seemed to be exhausted. He was aided to his feet by Mr. Binion and at his request was walked up and down the road until he became sufficiently exercised to regain his ability to walk and his powers of locomotion. These witnesses also state that appellant was very muddy and that his hand was bleeding and that he had some character of knot on his head. This was testified to also by a number of other witnesses who soon appeared upon the scene.

The horse with the buggy hitched to it was found at about 8:30 o'clock in the town of Olive Hill, which, as stated, is about a mile or a mile and a half beyond the scene of the tragedy. Some parties drove back to the scene with this horse and buggy and in it brought the girl to the City Hall of Olive Hill, where she was ministered unto and the next morning carried to the home of her father, where she died between twelve and one o'clock of that day, never having regained consciousness or ability to speak. At about the time the girl died the appellant was arrested charged with her murder.

After the death of the girl an autopsy disclosed that she was pregnant and there was removed from her a foetus, which the physician said was some three or four months old. There was also found to be on her head seven distinct wounds, each of them penetrating to the skull and three of them through the skull, and they appeared, according to the testimony, to have been made

with a sharp instrument and not with any character of club. It might here also be stated that the appellant appeared to have some scratches upon certain parts of his neck which had the appearance of having been made with finger nails. It is shown by Dr. Runyon, a physician at Ewing and who seems to have been the family physician of appellant, that the latter on or about March 8th, 1915, applied to the doctor for some medicine for his niece, he stating that she was suffering from cold and that his wife had informed him that the niece had been suffering from suppressed menstruations, she having for one time or more missed her monthly periods. The doctor prescribed and delivered to appellant medicine for each of these complaints. Appellant admits this, but says that he thought no more about it, and that as he observed that the cold had improved he thought the other ailment also had disappeared. Many other circumstances are shown by the evidence to exist, but we believe what we have stated sufficient to illustrate our rulings upon the questions presented for our determination.

First. Section 194 of the Criminal Code permits the trial judge, if he be satisfied after making a fair effort in good faith to obtain a jury in the county where the indictment was found that it is impracticable to get one from that county free from bias, to order the sheriff to summon a jury from some other county where such bias does not exist. The only evidence shown in the record which was presented to thus satisfy the trial judge is the affidavits of the defendant and two other persons, which are in substance that the magnitude of the crime and the fact that it had been tried once before in the county had caused a great deal of talk and many persons had expressed an opinion either for or against the appellant. It is not shown that any great or other number of influential citizens were arrayed against him, and as we take it the conditions were about such as the commission of this character of crime would ordinarily produce in any community, which is, more or less, talk. It is not shown that any person whatever had been engaged in molding or manufacturing sentiment against the appellant, but, on the contrary, that in the agitation of the matter he appeared to have about as many friends as did the prosecution. In considering the manner by which the judge should satisfy himself of the imprac-

ticability in obtaining an unbiased jury from the county, this court in the case of Roberts v. Commonwealth, 94 Ky. 499, said:

"The manner of satisfying himself of this impracticability is making a fair effort to obtain the jury in the county wherein the case is pending, and certainly the court is not to ignore the plain provisions of the Code, and be controlled and guided by the unsupported affidavit of the defendant."

And again in the case of Commonwealth v. Carnes, 124 Ky. 340, it is said:

"In this case, in view of the facts shown by the record, if the panel should be exhausted before a jury is made up, the judge should supply the jurors by drawing from the drum or wheel, and if, after a reasonable effort in this way, a jury cannot be obtained in Breathitt County, the court may, under section 194 of the Criminal Code of Practice, direct a jury to be summoned from an adjoining county.

For a still further discussion of this question, see Brown v. Commonwealth, 20 Ky. Law Rep. 1552; Mosely v. Commonwealth, 27 Ky. Law Rep. 214; Bowman v. Commonwealth, 146 Ky. 486; Sergent v. Commonwealth, 133 Ky. 284.

Under these authorities, the trial judge in this case should have made a reasonable effort to have obtained the jury in Carter County and if this had demonstrated to him that it was impracticable for him to do so, he would have been justified, and it would have been his duty, to have ordered the sheriff to summon the jury from an adjoining county where the citizenship was free from disqualifications for jury service. Not only was the judge not satisfied of such conditions in this case, but it is affirmatively shown that the jury was easily obtained from a venire of fifty men which the sheriff was ordered to and did summon. Under these circumstances, we find no merit in this his first contention.

Second. The theory of the Commonwealth is that the appellant is the author of the ruin of the girl and the cause of her pregnancy and that to hide the humiliation, shame and disgrace to himself and her, he committed the murder, and that this was the motive which prompted him to do so. It is the rule in this jurisdiction that in criminal cases if there is evidence upon which a verdict of guilty could be returned it is the duty of

the court to submit the evidence of the defendant's guilt or innocence to the jury under appropriate instructions and that in such cases the jury should not be instructed to find the defendant not guilty. Indeed, the law in this respect has gone so far as to permit a case to be submitted to the jury, when it is a criminal prosecution when under the same facts it might be error to have done so if the issue was one in a civil case. Following this rule it is apparent that the court committed no error in failing to instruct the jury to acquit the appellant. As there must be another trial of this case we refrain from pointing out the evidence looking to his guilt and for the same reason we decline to comment upon it.

Third. By this complaint it is urged with great earnestness that the court failed to give the jury by its instructions the whole law of the case.

But two instructions were given, number one submitting the issue to the jury as to the guilt or innocence of the appellant of the crime of murder, and number two is the reasonable doubt instruction. It is earnestly insisted that under the facts presented by the record there should have been given to the jury an instruction submitting to it the crime of manslaughter and another one upon self-defense. And in substantiation of this contention we are referred to the cases of Farris v. Commonwealth, 14 Bush 362; Bush v. Commonwealth, 78 Ky. 268; Greer v. Commonwealth, 111 Ky. 93; Messer v. Commonwealth, 76 S. W. 331; Ratchford v. Commonwealth, 16 Ky. Law Rep. 411; Bert v. Commonwealth, 116 Ky. 927; Frasure v. Commonwealth, 114 S. W. 268; Bast v. Commonwealth, 124 Ky. 747; Rutherford v. Commonwealth, 13 Bush 608. And a number of other cases from this court in which the facts were substantially similar to those in the cases just mentioned.

As illustrating the circumstances under which the rule contended for is applied, and the conditions only when it will be applied, we will make brief excerpts from some of the cases *supra*. In the Rutherford case, the statement in the opinion as to when the instructions contended for should be given this court said:

"When no witness introduced on the trial saw the homicide committed, or saw the parties after they met on the occasion when the killing occurred, the law applicable to murder, manslaughter, and self-defense should be given in order to meet any state of fact the

jury may find, from the circumstances in evidence, to have existed.''

In the Ratchford case, upon the point being considered, we said:

''No witness saw the killing, and it was said that, therefore, the homicide might have been excusable self-defense, manslaughter or murder, and as it was the province of the jury to ascertain to which category the killing belonged, it was the duty of the court to instruct on the law applicable to murder, manslaughter and self-defense in order to meet any state of fact the jury might find from the evidence to have existed.''

In the Bast case on the same subject, it is said:

''Thus it will be seen that in a number of cases this court has held that in instances where there was no eye witness to the killing, and the evidence is purely circumstantial, it is the duty of the trial court to give to the jury, as said in the Rutherford opinion, all of the law that might be applicable to the case as developed by the facts proven.''

In the cases referred to the evidence by which the guilt was sought to be fastened upon the defendant was purely circumstantial, and in some of them there was evidence of a scuffle having taken place by which it might be inferred that the defendant and the murdered person may have been engaged in an encounter out of which the killing grew, and from this the court held that, under such circumstances, it was the duty of the trial court to give to the jury instructions upon all of the points which it was possible for it to find from the evidence to have existed. It will furthermore be noticed that the cases in which the rule contended for must be applied are those in which the testimony is entirely circumstantial and there are no *eye-witnesses* to the commission of the crime. We can readily see that if the evidence is entirely circumstantial and only established the *corpus delicto,* and other circumstances from which it might be inferred that the defendant had some connection with the crime, he would be entitled to the instructions contended for out of due regard for human life and liberty. The law has extended to him this privilege but it has never been carried further. On the contrary, it has been determined in a number of cases from this court that where the record presents no room for any possible theory, except that of murder or inno-

cence, there is no room for a manslaughter or self-defense instruction. And where the defendant as an *eyewitness* testifies as to how the homicide occurred which is consistent with his innocence, he has removed the only reason for the application of the rule announced in the cases to which his counsel refers us. The reason which this court in the cases *supra* gives, as a justification for the rule which it therein announces, no longer exists, and it is a familiar principle of law that when the reason ceases the rule ceases. However much regard the law may have for one charged with crime, and however vigilant it may be that his trial should, in all respects be fair and free from prejudicial error, we have been unable to find where the principle just announced is not equally applicable to the criminal branch of the law as well as to others. Moreover, the defendant cannot complain of an alleged abuse of his rights when he by his own testimony justifies the action of which he complains as constituting such abuse. And so in the case of Wellington v. Commonwealth, 158 Ky. 161, this court, in denying a similar contention but under circumstances more favorable to the defendant, said:

"Appellant complains of the failure of the court to instruct the jury upon the whole law of the case, and especially to give instructions upon manslaughter and self-defense. It is the general rule that where the evidence of a homicide is purely circumstantial ordinarily it is the duty of the court to give the whole law of the case, and especially where there is evidence of a struggle at or about the place of the killing; but in this case, if the theory of the Commonwealth is correct, while there was no eye-witness except appellant himself the evidence is not wholly circumstantial, but rests almost entirely upon the statements of appellant himself, and no one of three witnesses testifies to any statement of appellant as to how the killing occurred or any statement of his indicating that there was any struggle between them or any altercation whatever. The testimony of the three witnesses as to the statement of appellant, that he had killed Longnecker on the island without giving the details as to how he had done so, when taken in connection with his previous threats and with the very plain motive which actuated him, almost necessarily precluded the idea that there was a struggle or that the killing was done in self-defense. Certainly if appellant

himself had not testified, and there had been no evidence except that of the three witnesses, the action of the court would have been proper.

"But, taking appellant's version of the matter, we cannot see how he could possibly have been prejudiced by a failure to give a manslaughter or self-defense instruction, when he himself testified that he did not do the killing, and another did; for if the jury had believed his statement appellant would of necessity have been acquitted."

In this case if only the body of the murdered girl had been found and evidence of tracks and other indications of a possible struggle, without any explanation having been made by the appellant, the rule for which his counsel contends would not only have been proper, but it would have been mandatory on the trial court to have applied it; but, when by his own testimony he has removed the reason for the application of the rule, he cannot complain because the court failed to give him the benefit of it, nor will the law stultify itself under such circumstances by demanding of those into whose hands its administration is given, to do a vain and useless thing. We are convinced that the court gave to the jury all the law applicable to the facts of the case and there is no foundation for this third contention.

Fourth. The Commonwealth introduced as a witness Dr. Stumbo, who is a distant relative of the appellant and who was his associate in their youth, the doctor now residing and practicing medicine at a place called Weeksbury in Floyd County, which is perhaps 75 miles or more from the place where appellant resides in Fleming County. This witness was permitted to testify over the objection of appellant as to the contents of a letter which it was claimed by the Commonwealth that the appellant had written to the witness some time in March preceding the homicide. The witness did not know the initials of the person's name who wrote the letter, nor did he know whether it was either written or signed by the appellant; neither did he read the letter. He testified that a letter, which he thinks was written by a man by the name of Frasure, was received at his post office and it was read to him by his wife, and after that it was thrown into the fire, and therefore could not be produced. Notwithstanding all this, he was permitted to state before the jury the substance

of what his wife read to him. The contents of that letter as he says it was read to him, and his testimony as it appears in the record are as follows: "Q. Now, if you remember what the substance of that letter was, state it? (Objected to by defendant). By the court: You are only required to state the substance of the letter. (Objection overruled. Defendant excepts). A. I can state that. My best recollection, my wife, read the letter to me herself. (Objected to by defendant). By the court: You were present when she read it? A. Yes, sir. She was the only person present. (Objection overruled. Defendant excepts). A. (continued) The way I remember the contents of the letter, that he would—Frasure would—it was from a Mr. Frasure, whatever Mr. Frasure·it was. I don't remember that it was Mr. R. S. Frasure at all—don't remember the post office that it was from—my wife called my attention to it at the time and said this man—called his name—and asked me where the post office was. I says I don't know where this post office is, and called it and says I don't know, and the way I remember the contents of this letter, he wanted some medicine for a woman that was sick and that she had missed her periods either a month and a half or two months and a half—the half was to it—but I am not stating that it was two and a half or one and a half or what it was, I don't remember, but the half was there—he said the woman had missed this long—missed this much—missed her period, already that much, and that he would like for me to send her medicine that would help her if I could do so, and that is about all there is to that part of it at the present time."

We have previously stated that the theory of the Commonwealth is that the appellant is guilty of causing the pregnancy of the deceased, and to establish this theory it was important that it should show any fact looking to connecting 'him with her ruin, and it was for this purpose that' this testimony was offered and introduced. That it, if true, went far towards establishing his guilt of this homicide there can be no doubt, for it is a well-known fact that crimes are scarcely ever committed without a motive, and it requires no very great effort to see that one guilty, and especially if an uncle, of the seduction of a female resulting in pregnancy, might, in order to prevent exposure, be driven

even to the act of murder. In fact, the history of the country teaches us that there are many such instances. But the evidence of motive must be established by the well regulated rules of practice as much so as any other fact. It is true that it was in evidence that the subject matter of this purported letter had been discussed between appellant and his home physician. Under the circumstances, however, it would not ordinarily give to it a guilty taint because it is nothing unusual for such matters to be discussed in one's neighborhood or with one's family physician.

If, however, advice is sought from a great distance and from a relative and boyhood associate, an altogether different conclusion might be drawn from it. These acts would show deep solicitude and display more than ordinary interest upon the part of the one seeking the information and give color to the belief that some sinister motive prompted the inquiry. We can well imagine how a skillful prosecutor, in his closing argument to the jury, could draw a most convincing picture of the guilt of the appellant, from the writing of this letter, of the crime of seduction sought to be established as the motive for this murder, which, when done, is a most forward step toward his conviction of the murder with which he is charged. Unless the contents of this supposed letter found its way to the jury through the protecting channels of the law for the introduction of testimony, it was highly prejudicial to permit the witness to testify concerning it. That this was not done is plainly manifest. All rules permitting the introduction of writings for the purpose of charging one with admissions therein made, or for other purposes, require that the genuineness of the writing must first be established or there must be sufficient evidence of it to justify a jury in finding it to be so. It is not shown that the appellant wrote this letter, or that his name was even signed to it; nor is there any evidence to justify the jury in finding that he wrote it more than a mere unauthorized suspicion. The rule is equally imperative that if the writing cannot be produced because of becoming lost or destroyed, the witness who testifies concerning its contents must himself have seen the contents, and his information must not have come to him through another person. In that case it would be hearsay pure and simple. It will be seen from the testimony

of the physician Stumbo that he did not read the letter but that it was read to him by his wife. This is a flagrant violation of the last rule to which we have just referred. The testimony then of this witness lacked two vital essentials of measuring up to legal testimony, they being, that the letter was not properly authenticated, and the contents of it were given to the jury second hand, or by a witness who had heard another say what was contained in it.

Considering the nature and probable effect of this testimony, it is perfectly clear to us that the court erred to the great prejudice of appellant in permitting it to be introduced in the manner it was. This does not mean that trials shall be conducted with such technical strictness as to render them free from all error whether prejudicial or not, but it does mean that all of the signboards and guideposts erected by the ripened experience of mankind to direct the courts in arriving at the truth and justice in the conduct of trials, shall not be torn down and destroyed, or altogether ignored.

For the reasons stated the judgment is compelled to be and is reversed, with directions to grant appellant a new trial and for proceedings in accordance with this opinion.