## Sergent v. Commonwealth.

(Decided January 18, 1924.)

### Appeal from Letcher Circuit Court.

1. Homicide—Court Erred in Not Giving Instructions as to Manslaughter and Self-Defense.—In a prosecution for conspiracy to murder, where there were no eye-witnesses to the killing, the court erred in not charging on manslaughter and self-defense, though there were no visible signs of a struggle, and the body of deceased was found with a large hole in the back of his head, it appearing that there were footprints in and around and leading away from the body, and that a fire had been kindled near.

2. Criminal Law—Requiring Accused to Testify to Marriage with Negro Prejudicial Error.—In prosecution for conspiracy to murder husband, it was error and prejudicial to require defendant to

testify that after the death of her husband she married one having negro blood, and had to go out of the state in order to do so.

D. D. FIELDS & DAY and F. W. STOWERS for appellant.

THOS. B. McGREGOR, Attorney General, and LILBURN PHELPS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE ROBINSON—Reversing.

Appellant was indicted in the Letcher circuit court with several others, accused of unlawfully, wilfully and feloniously conspiring to murder Elijah Sergent, and upon trial at the special July term, 1923, was convicted and sentenced to the penitentiary for life.

The case as presented by appellant may be summarized as follows: She and her husband, Elijah Sergent, resided on Indian creek in Letcher county, and on Sunday evening, December 21, 1919, he left his home early in the afternoon, going to the residence of M. B. Bates. He had on his way met one J. H. Niece, of whom he also inquired if he had seen Uriah Bates during the day, and requested him to notify the latter that he wished to see him. Sergent then went over to Rockhouse creek, following it to the mouth of Indian creek, accompanied by Niece, and they there met Uriah Bates. Niece left, leaving them engaged in conversation. The evidence discloses that some time later, when standing in his front door, Niece observed Sergent returning from the direction of Rockhouse creek apparently on his way home; and this is the last time he was seen alive, his body being found some eleven days later upon a ridge of the mountain side and not far distant from his home as well as that of Niece and several of the Bates families.

There is some testimony tending to show that intimacy of a more or less questionable character had for some time existed between Uriah Bates and Jane Sergent (the appellant); and it would appear that Sergent, having learned of certain rumors relating to this, upon one occasion visited Bates and asked him concerning it. The latter denied the allegations, and, as he expressed it, offered to accompany Bates to a magistrate where he would "swear himself clear;" but upon visiting the home of this official, he was absent. A short time later Uriah Bates was arrested and indicted for the murder of Sergeant, and upon trial was convicted, being sent

to the penitentiary for life; and subsequently Jane Sergent (the appellant) was also indicted and convicted, receiving a life sentence, from which she appeals.

Throughout the record we fail to find testimony of a very substantial character tending to show her connection with a conspiracy, or any conclusive evidence of her guilt. A number of witnesses testified in behalf of the Commonwealth, several of whom made statements of a more or less damaging nature. One (to whom Elijah Bates was reported to have been rather attentive) said appellant had told her that if she did not already have a man, she would endeavor to win Bates' affection from her; that he was a money maker and she wished he was with them at the time. Another testified that during the interim between the disappearance of Sergent and the finding of his body, appellant had made different assertions relative to his absence, one to the effect that she knew he was dead when he did not return to his home Sunday night, and another that she felt convinced he would never be found alive; also that almost a year before this occurrence when she, accompanied by Uriah Bates, her daughter (Edith) and a neighbor were riding over the mountains, appellant and Bates rode ahead a short distance and seemed to be engaged in earnest conversation, at the close of which they shook hands; and further that on Monday morning following the disappearance of Sergent appellant went down Indian creek with a neighbor, and upon meeting Bates talked to him for some ten of fifteen minutes out of hearing of the others. However, in her evidence she explains that when her husband disappeared she had simply said he might be dead, and upon his failing to return had told a neighbor that he had left his home upon other occasions, and she felt this disappearance might have been due to a determination to live elsewhere. When she was seen to shake hands with Uriah Bates at the time they were riding he had told of having in his possession a license to marry her daughter Edith, and upon her questioning the truth of the statement or the sincerity of his intention, he held out his hand and said, "I will shake with you on the truth of it;" and further when she was seen talking to Bates the morning after her husband disappeared she had first asked him if he knew anything of his whereabouts, and and also in a lower tone desired to know if he had been drinking, as had been his custom sometimes in the past.

The testimony further discloses that early on Monday morning she had gone to the home of the deceased's brother and also a number of other neighbors, apparently making the most earnest and diligent inquiries concerning him. She had also visited a number of neighboring villages and there endeavored to locate him; and after the arrest of Uriah Bates, charged with his murder, she had, out of her meager savings, paid $300.00 to an attorney that he might aid the Commonwealth in his prosecution.

In support of their motion for a new trial, attorneys for appellant offered ten grounds for a reversal. However, after carefully reviewing the evidence, we feel that there are but two that need to be seriously considerd. These are 2 and 3:

> 2. "Because the court failed to give the jury the whole law of the case in instructions and should have instructed the jury upon the law of manslaughter and upon the law of self-defense."
> 3. "Because the court erred in permitting to go to the jury in favor of the Commonwealth, incompetent evidence."

In the second ground it is urged with great earnestness that the court failed to give the jury by its instructions the whole law of the case.

Counsel for appellant argued that under the circumstances it was the duty of the court to have given an instruction as to the crime of manslaughter, and another on self-defense; and in support of this contention a number of cases are cited; and as evidence of the circumstances under which the rule sought is applied and the conditions under which it should be applied, we will make brief excerpts from some of them.

In Rutherford v. Commonwealth, 13 Bush 608, the court said:

> "When no witness introduced on the trial saw the homicide committed, or saw the parties after they met on the occasion when the killing occurred, the law applicable to murder, manslaughter, and self-defense should be given, in order to meet any state of fact the jury may find, from the circumstances in evidence to have existed."

In Ratchford v. Commonwealth, 16 R. 411, it was held that:

> "No witness saw the killing, and it was held that, therefore, the homicide might have been ex-

cusable self-defense, manslaughter or murder, and
as it was the province of the jury to ascertain to
what category the killing belonged, it was the duty
of the court to instruct on the law applicable to mur-
der, manslaughter and self-defense in order to meet
any state of fact the jury might find from the evi-
dence to have existed."

In Bast v. Commonwealth, 124 Ky. 747, the court
said:

"Thus it will be seen that in a number of cases
this court has held that in instances where there was
no eye-witness to the the killing, and the evidence
is purely circumstantial, it is the duty of the trial
court to give to the jury, as said in the Rutherford
opinion, all of the law that might be applicable to
the case as developed by the facts proven."

And further in Frasure v. Commonwealth, 169 Ky.
628, it is said:

"In the cases referred to the evidence by
which the guilt was sought to be fastened upon the
defendant was purely circumstantial, and in some of
them there was evidence of a scuffle having taken
place by which it might be inferred that the defend-
ant and the murdered person may have been en-
gaged in an encounter out of which the killing grew,
and from this the court held that, under such cir-
cumstances, it was the duty of the trial court to give
to the jury instructions upon all of the points which
it was possible for it to find from the evidence to
have existed. It will furthermore be noticed that
the cases in which the rule contended for must be
applied are those in which the testimony is entirely
circumstantial and there are no eye-witnesses to the
commission of the crime. We can readily see that
if the evidence is entirely circumstantial and only
established the *corpus delicto,* and other circum-
stances from which it might be inferred that the
defendant had some connection with the crime, he
would be entitled to the instruction contended for out
of due regard for human life and liberty."

While there were no visible signs of a struggle hav-
ing taken place at the spot where the body of Sergent
was found with a large hole in the back of his head, the
evidence shows that there were footprints in and around

and leading down the hillside from it, and further that a fire had been kindled close to the body, the burnt embers being plainly discernible; and considering the fact that appellant was charged with the offense of murder, and there being no eye-witnesses, we feel that the instructions for manslaughter and self-defense should have been given.

Ground 3 urged by attorneys for appellant would, in our opinion, if no others had been advanced, be of sufficient importance to indicate the necessity of a reversal.

It appears that in her cross-examination by the Commonwealth's attorney the court permitted him, over the serious and continued objections of her attorney, to ask a number of questions highly prejudicial and of a character calculated to influence the jury strongly against her in considering the case.

It seems that some time after Sergent was killed appellant had re-married; and during her cross-examination the Commonwealth's attorney propounded some questions which he knew, or should have known—to express it mildly—were taking an unfair, unjust and unwarranted advantage of appellant, a practice that should be discouraged among those whose duty it is to protect the innocent as well as punish the guilty. The testimony referred to began with question No. 12, page 127 of the transcript:

"12. Are you married or single?

A. Married.

13. How long have you been married the last time?

A. A year, little over.

14. Where did you marry the last time?

A. Ohio.

15. In Ohio?

A. Yes, sir.

16. What did you go to Ohio to marry for?

Defendant objects.

The Court: I will let him go a little farther; there is something I want to find out.

Defendant excepts.

17. Who was it you married?

Defendant objects. Overruled. Exception.

A. I married a Gibson.

18. What made you go to Ohio to marry?

Defendant objects. Overruled. Exception.

19.  Go ahead and tell us.

A.  Because I couldn't get married here.

20.  Why couldn't you get married here, you were single?

Defendant objects.  Overruled.  Exception.

21.  Was you single?

A.  Yes, sir.

22.  Why couldn't you get married here?

Defendant objects.  Overruled.  Exception.

23.  Go ahead and tell us.

A.  I married a mixed blood.

24.  How mixed was he, 'nigger' or white man?

Defendant objects.

The Court: I don't believe I will let that go to the jury.  I think it is sufficient she said he was a mixed blood, that is the reason why she couldn't marry here.

25.  How dark colored was he?

Defendant objects.

The Court: I believe I will let that go; tell whether he was black or white or yellow or whatever he was.

Defendant objects.  Overruled.  Exception.

26.  Go ahead and tell us.

A.  Well he was brown, black.

Defendant moves to strike the evidence from the consideration of the jury.

The Court:  I will take that up later; possibly that ought to be stricken, it might be prejudicial. I will not just now; I may before we get through.

Defendant excepts."

During this testimony it will be observed that the court on several occasions seemed desirous of satisfying his own curiosity relative to the actions of appellant; and while he admitted that much of it was incompetent and prejudicial, nevertheless he failed to sustain the objections of appellant's counsel, and order it stricken from the consideration of the jury.  However, even this, in all probability, could never have removed from their minds such prejudice as testimony of this character was calculated to produce; and a due and just regard for the rights of one charged with crime must and should be exercised.  It is not within the province

of a court to permit evidence of such a character to be brought to the attention of the jury when it is clearly seen that in its very nature it is so prejudicial as to possibly prevent their reviewing the whole testimony in a calm and dispassionate light.

Therefore, in considering the nature and probable effect of this evidence it is perfectly clear to us that the court erred to the great prejudice of appellant in permitting it to be introduced in the manner it was, or at all.

It is further complained under this ground that the court erred in permitting the witness, Bobbie Bates, to detail his acts in secreting a broken gun under the house of Hoss Niece some time after the killing for the purpose, as stated by the witness, of fastening the crime on some one other than Uriah Bates, his brother, and to detail some conversations, containing guilty admissions, which witness had with appellant's co-defendant and alleged co-conspirators some days or perhaps weeks after the killing occurred, which testimony is found on pages 79, 80, 81 and 82 of the transcript of the evidence, beginning with question 15 on page 79. The appellant was not present upon any of those occasions testified to by the witness, and there is nothing in the record connecting her in any way with them. We are familiar with no rule under which such testimony could be rendered competent as against appellant, even if the Commonwealth's testimony was sufficient to connect her with a conspiracy, for no practice in criminal procedure is better settled than the rule denying the competency of statements and admissions of a co-conspirator as against his fellows made after the object of the conspiracy was accomplished, to which, however, there are some exceptions, but the evidence referred to does not come within any of them. It was so stated by the court upon the trial in ruling on objections to the testimony when he said: ''I will let him tell it, but I will tell the jury at the same time not to consider that as against this woman. I want to find out about that for my own curiosity.'' The court did admonish the jury to not consider any of the witness' testimony against the appellant, but it is doubtful if the admonition removed entirely the prejudicial effect produced by it, and upon another trial the court will exclude all of it.

On the sufficiency of the evidence to sustain the conviction we will express no opinion, as upon another trial its complexion might be entirely changed.

For the reasons stated the judgment is compelled to be, and is reversed, with instructions to grant appellant a new trial, and for proceedings consistent with this opinion.

Judgment reversed.