## Roberts v. Commonwealth.

(Decided February 24, 1928.)

### Appeal from Laurel Circuit Court.

1.  Homicide.—In prosecution for murder, evidence held sufficient to require submission of case to jury.

2.  Homicide.—Submission of instructions as to conspiracy to commit murder held error, where there was no evidence of conspiracy of defendants.

3.  Homicide.—In prosecution for murder, where case rested on purely circumstantial evidence, and accused claimed that he was not present at time of homicide, and it devolved on court to give jury law applicable to murder, manslaughter, and self-defense, and in instruction on self-defense court told jury that accused could not rely on such defense if he provoked and brought about difficulty, and no evidence was offered to support modification of self-defense instruction, held modification was prejudicial error, necessitating reversal.

R. L. POPE, O. W. BLACK and REAMS & JOHNSON for appellant.

J. W. CAMMACK, Attorney General, and JAMES M. GILBERT, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Reversing.

The appellant was convicted of the crime of willful murder, and sentenced to life imprisonment. He appeals.

The various grounds relied on for reversal may be grouped under two heads: (a) Appellant was entitled to a peremptory instruction; and (b) the court erred in giving the instructions it did. To dispose of the first contention requires a resume of the evidence.

The appellant and the deceased, Daw Byrley, were rivals for the hand of Maucey Sasser. All of these parties were less than 20 years of age. On account of her tender years, Maucey Sasser's father, Abe Sasser, was very much opposed to any young man "talking to her," which expression in their neighborhood means "courting." In February, 1926, the appellant and Maucey Sasser arranged to elope. By agreement they met in a barn on her father's farm. The appellant ill-advisedly brought his rival along to assist him in the elopement. When the parties met in the barn, Byrley threatened, if the parties persisted in their intention of eloping, to go up to the house, and tell Maucey Sasser's father about it. So the elopement was abandoned, but the appellant was so provoked at Byrley for his interference that he pulled out his revolver and flourished it about, some of the witnesses saying that he punched Byrley with it, though other witnesses say that he merely punched the side of the barn. All agree, though, that the appellant was very angry. However, no blood was shed.

Thereafter Byrley went to Detroit to work. He was soon followed by the appellant. The two roomed together in that city, and it seems that both of them were corresponding with Maucey Sasser back in Laurel county. A controversy arose in Detroit between the appellant and Byrley over some of this correspondence. Some witnesses were introduced who testified that the appellant made in Detroit threatening remarks concerning Byrley. The appellant denied this. He returned to Laurel county in August, 1926, and at the county fair held during that month he and Maucey Sasser were married. The commonwealth produced further testimony tending to show that the appellant, after his marriage, made the statement that the only way for him and Byrley to get along was for them to be in different states. The appellant denied making any such statement. Byrley returned to Laurel county some time during the fall of 1926. The appellant and his wife at that time were living with the appellant's father, whose farm was located about four miles away from Abe Sasser's farm. On the

Sunday following Thanksgiving Day, Byrley attended services at Freedom Church in company with a young lady named Miss Stewart, who lived in a settlement just beyond the farm of appellant's father. After church was over, Byrley, riding a gray horse, escorted this young lady to her home. In so doing he had to pass the farms of Abe Sasser and appellant's father. About dusk he started on the return trip to his own home, which took him back by the Sasser and Roberts farms. Just at "dusky dark" two shots were heard to ring out from a bottom near the Sasser farm. Two passways led through this bottom from the main road which skirted the Sasser farm. Later on in the evening a witness passing through this bottom discovered Byrley's gray horse loose in the bottom. He tried to lead the horse out to the public road, but, the horse balking, he tied it to a tree and went his way.

A short while before the shots were heard in the bottom two men, one by the name of Jones, passed through this bottom. This man Jones had had, while working in East Chicago, Ind., his clothes attached for a board bill, and there is some intimation in the record that Byrley was responsible for this attachment. But there was no proof of any ill feeling between Jones and Byrley over this or any other cause. The commonwealth introduced two witnesses who testified that just before the shots were heard in the bottom they saw Abe Sasser on the hillside near the bottom in the attitude of handing something to an invisible party. Sasser, admitting he was out on the hillside, said he had been feeding his hogs, and was handing a bucket to his wife. One of these witnesses testified that at this time she heard a masculine voice in the bottom exclaiming: "Don't do that, Dan," which remark was immediately followed by the shots. Another witness for the commonwealth testified that shortly after these shots were fired he saw the appellant and his wife near a bridge which is located quite near to this bottom.

About 2 o'clock Monday afternoon Byrley's body was found in the bottom about 25 steps away from the public road. He was lying on his back, with his arms folded over his breast, with one knee slightly elevated. He had been shot through the breast; the ball ranging upward. His face was powder burned, and there was a hole through his cap, which was found near by. Twenty-

five or so steps away, and out on the public road, there was found a switch somewhat longer than that usually carried by those riding horseback. On the switch were found some hairs that appeared to belong to a gray horse. Some cotton wadding was found by this switch. There was evidence tending to show that it was the kind and character of wadding with which the cap of the deceased was stuffed. But there is also evidence tending to show that this wadding might have come from a quilt, which Abe Sasser, after the dicovery of the body, carried down from his house for the purpose of covering it. On a tree by the place where this switch was found, and about eight feet up, was a nicked spot where a bullet had grazed the tree. There is quite a dispute in the evidence whether this nicked spot was an old one, or whether it appeared to have been made about the time the shots were heard in the bottom. The deceased was shot with a .32 caliber pistol. It is conceded appellant owned a pistol of this caliber. However, some six weeks after the discovery of Byrley's body, a pond some 10 or 12 steps away from where his body was found was dragged by some friends of the appellant, and a .32 caliber pistol found in it. There is also a great dispute whether when this pistol was found it showed evidence of having been in the water a short or a long time.

The appellant's evidence tended to show that at about 3 o'clock on the Sunday afternoon of the homicide he and his wife left their home to go to the Sasser post office, which was located near the Sasser farm. They claim that they were going after a dress which Mrs. Roberts had ordered from Sears-Roebuck. At this time there was a post office named "Bush," located just about a quarter of a mile away from the Roberts farm. The appellant and his wife, however, say that she had ordered the dress sent to the Sasser post office because she wanted to get it on Saturday afternoon, and the mail came a day earlier to the Sasser post office than it did to the Bush post office. The commonwealth's testimony, however, tended to show that the mail was delivered as promptly to the Bush post office as it was to the Sasser post office. There is no explanation in the record as to why appellant's wife waited until Sunday to go after the dress which she had had sent to the Sasser post office so as to get it on Saturday. Appellant and his wife say that, after they had gone about a mile towards the Sasser post office, she informed appellant that her father wished them

to come over the next morning to assist in digging some potatoes, and that thereupon the appellant said they could just get the dress the next morning when they went to her father's farm. Instead of returning by the highway to their home, appellant and his wife say they circled around through the fields, because the main road was muddy. They thus explained why it was that, although several neighbors saw them on the road going towards the Sasser farm, no one saw them returning to the Roberts farm. Appellant and his wife further say that they got back to the Roberts farm while the sun was yet high in the heavens, and that they remained there until the next morning. They produced other witnesses who vouched for their presence at the Roberts home from long before dusk until after these shots were heard in the bottom. In addition, the appellant procured proof showing that Byrley in his lifetime had several times expressed the idea that if he could not win Maucey Sasser's hand he had no desire to live.

Although, as appellant says, this was a very close case, yet it was one for the jury. The commonwealth's testimony, if believed, showed that there was bad feeling between the appellant and the deceased; that a masculine voice exclaimed, just before the shots in the bottom were fired: "Don't do that, Dan;" that the appellant and his wife were seen about dusk very near the place where the body of the deceased was later found; that the position in which Byrley's body was found negatived any idea of suicide, since one could have hardly shot himself as deceased was shot, thrown the revolver into a pond, and then walked some 10 or 12 steps away to lie down in the composed position in which this body was found. It is true the appellant's testimony, if believed, established an alibi for him, but it was for the jury to say what all the testimony introduced it did believe. Appellant was, then, not entitled to a peremptory instruction.

Turning to ground (b) relied on for a reversal, we find many complaints made with reference to the instructions which the court gave. The appellant, his wife and father-in-law, were all indicted and tried together for this homicide, the indictment in separate counts charging each one with having actually shot and killed the deceased, the others aiding, assisting, and abetting the one so shooting and killing the deceased, and further charging all three with having entered into a conspiracy to commit this murder, and having committed the murder

pursuant to such conspiracy. There was no evidence whatever of a conspiracy existing between the three accused, but the court submitted the case against all three of the defendants on each aspect of the indictment. The jury, as stated, found the appellant guilty, but promptly acquitted his wife and father-in-law. As there was no evidence of any conspiracy, the court should not have submitted the question of a conspiracy to the jury. Whether such a submission was a harmless error, in view of the fact that the jury acquitted the appellant's codefendants, and hence could not have convicted appellant under the conspiracy instructions, we need not determine, for this case must be reversed on another ground, and on a retrial the court will eliminate from the instructions all references to a conspiracy. In view of this, we will not discuss the complaints appellant makes with reference to these conspiracy instructions.

This being a case resting on purely circumstantial evidence, and the accused claiming that he was not present at the time of the homicide, it devolved on the court under the many decisions of this court to give the jury the law applicable to murder, manslaughter, and self-defense. In Frasure v. Commonwealth, 169 Ky. 620, 185 S. W. 146, may be found a collection of the authorities covering this principle of law, together with its limitations. The trial judge followed this principle of law, but in the instruction on self-defense he told the jury, in substance, that the appellant could not rely upon such a defense, if he provoked and brought on the difficulty. There was no evidence to support such a modification of the self-defense instruction, and such modification, because of this, was a prejudicial error which will necessitate a reversal of this case. Estepp v. Commonwealth, 185 Ky. 156, 214 S. W. 891; Jamerson v. Commonwealth, 222 Ky. 70, 299 S. W. 1093. On the next trial of this case the court will redraft instruction No. 3 to obviate the equivocal nature of that instruction. So far as pertinent, it reads: "If you shall have a reasonable doubt from the evidence of defendants or either of them having been proved guilty."

This may be read that the jury, in order to acquit the appellant on the grounds of a reasonable doubt, should entertain that doubt only from the evidence of the defendants, or it may be read to mean, as we are sure the court intended it to do, that, if the jury had a reasonable doubt from all the evidence that the defendant had been

proved guilty, they should find him not guilty. Whether this alone would warrant a reversal we do not decide, but, as the court will have opportunity to correct this instruction on the next trial, it should do so. We find no merit in any of the other complaints urged against the instructions.

Judgment reversed, with instructions to grant the appellant a new trial in conformity herewith.