## House v. Commonwealth.

(Decided Dec. 1, 1933.)

MURRAY L. BROWN for appellant.

BAILEY P. WOOTTON, Attorney General, and D. C. WALLS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE PERRY—Affirming.

The appellant, Jasper House, was indicted by the grand jury of the Clay circuit court at its April term, 1932, for the willful murder of George Cupps. Upon his trial, he was convicted of voluntary manslaughter and sentenced to a term of twenty-one years in the state penitentiary.

He urges on his appeal from that judgment (1) that, as his conviction was secured upon circumstantial evidence alone, which was as consistent, he contends, with the defendant's innocence as with his guilt, it was insufficient to support the verdict; (2) that the venue of the prosecution was not proven by the commonwealth; (3) the admission of incompetent and highly prejudicial testimony; and (4) that the court erred in its instructions given to the jury.

The evidence shows that on Monday, April 11, 1932, the appellant, Jasper House, and the decedent, George Cupps, went to London, Ky., for the purpose of trading mules and horses, as was the custom there on county and circuit court days. While there, they met up with each other and indulged in more or less drinking, and late in the afternoon, they, with five or six others living in their neighborhood, left London to ride back to their homes in Clay county, some fifteen or more miles distant. Further, the evidence shows that the appellant and the decedent were each riding a mule upon this occasion, the appellant's being much the larger, and

that they arrived at Allen's house about 6 o'clock p. m., or about "dusky dark," as some of the witnesses termed it, where they stopped some minutes at the barn and talked with the Allens. It appears that, when they arrived and stopped at Joab Allen's, they were out of liquor, when Cupps looked up Marion Allen and secured another supply. The evidence is also that, as these three were riding from Allen's home towards the gate, the appellant asked Cupps to give him a drink of the whisky, when he handed appellant his jar of whisky from which he drank some and then put the jar back into his own pocket, where he kept it.

In view of the appellant's first contention made that the commonwealth's evidence was insufficient to establish defendant's guilt, in that he insists there were no eye witnesses but the evidence was circumstantial only, and such in its character and probative effect as made it equally as consistent with his innocence as with his guilt, so claiming, he argues that the accused was entitled to an instruction to acquit him. To clearly dispose of this criticism we deem it needful to here make a statement and analysis of the commonwealth's evidence heard upon the prosecution.

The evidence is all pretty much in accord in so far as it shows the actions of the decedent and the accused in their journey to London, upon April 11, 1932, a county court day there, and the fact of their getting together in London and having some drinks and their later returning, with some five or more neighbors, towards their homes, who all testified as to their being then friendly, and talking of a mule trade, and as to their stopping at the barn of Joab Allen, where, it is admitted, that the decedent secured a jar of whisky to resupply their exhausted store; also that while appellant, House, and Cupps were stopping there, they saw and talked with Joab Allen, his sons Marion and Ben Allen, and Tom Buttry, all of whom testified that the deceased, George Cupps, was at the time reeling drunk in his saddle, and fell from the little mule on which he was riding; that appellant was also drinking, but showed much less the influence of the liquor than Cupps; and, further, that Cupp's condition was so bad that Marion Allen climbed up on the little mule behind Cupps to take him home, when they, together with the appellant, House, riding what they called his "big mule," started down

the road towards Cupps' home, going as far as the gate or bars along the road some hundred and fifty yards below the Allen home, where Marion Allen got down and opened the gate for them to go through by a shorter way to the Cupps home. It appears that, during their ride down from the house to this gate near an old barn, some question arose between Allen and the appellant as to trading appellant's mule for a cow and a calf of Allen's, and that Allen told House to go back to the barn and look at his cow and calf with a view to making the trade, and that appellant left Cupps and Allen waiting at the gate while he went to the barn to look at the cow and calf.

From this point the evidence of the commonwealth's witnesses and that of the appellant is conflicting, the appellant contending that, as he returned from looking at the cow and calf, he met Marion Allen returning from the gate to his home who told him that they could not trade, and that he, the appellant, passed on for a short distance when, failing to find or see the deceased at the gate or anywhere, he abandoned his purpose to go home with him and turned back and started for his own home and did not again see the deceased after having previously left him waiting at the gate with Allen.

Allen's testimony, however, is as to this that he and the deceased, Cupps, waited at the gate for appellant to return from the barn, and that he did return and rejoined them there, when he advised the deceased and House to go through the gate and across the bottom, as being the nearer way to his home, when appellant suggested that they go the longer road around the hill, to avoid fences, which witness told him were down, but notwithstanding this the appellant and deceased, each astride his mule, started down the longer roadway, leading around the hill, where they together passed out of witness' sight and after which George Cupps was not seen again by the witness Allen until about an hour later, when the Hubbard boys, his neighbors, came to his home and informed him of Cupps having been killed, when he, with others at the Allen home, went back up the road with them some two hundred and fifty yards beyond the gate and old barn from where Allen had last seen the deceased ride off with the appellant,

where they found Cupps, "lying upon his back in the middle of the road, dead," with one end of his mule's bridle tied in a running noose about his neck, and the mule standing nearby, tied with its other end. The decedent was wearing what the witness termed a "slicker," the back of which was very muddy, and worn, while upon his face there were found ugly wounds, cuts, and bruises, and his nose broken, yet there was no mud upon his face, which, according to the testimony of his wife, was "as bloody as a butchered hog."

An examination was also made by the witnesses of the road about and around where the body was found, who testified that they found that Cupps' body had been dragged, while thus tied to his mule's bridle end, for a distance of some eighty or ninety steps down the road from an upper point thereon where it appeared a conflict or struggle had first occurred in the road between the deceased and his assailant, as was there indicated by the crossing of many tracks and three or four pools of blood there found some three or four feet apart, from the farthest of which the road signs showed that the body had been dragged down the road, to where it was found, as stated, with the ears bleeding and tongue hanging out. The evidence showed there were but few rocks in the road along where the deceased's body was dragged by which his face could have been bruised and cut through coming in contact therewith and that it had not come in contact with any road dirt or rocks, as was indicated by the absence of mud upon deceased's face. The evidence is further for the commonwealth, as given by Hughie and Jasper Hubbard, that they were on the evening when this charged crime was committed at the home of their father, which is distant about one hundred and fifty yards below the point where they found the deceased's body in the road, and had heard the noise and hollering of two seemingly drunken men down on the road about one-half or three-quarters of an hour after dark; from what they heard, it appeared that "one of them had fallen off his mule and that the other was trying to get him back on; that they heard one hollering and telling the other to get on his horse," and then a shot and then something like a man getting on his horse, and that "it sounded like he dragged him apiece, and then stopped, and then dragged him again,

and it was not but a few minutes until somebody came up the road." Jasper Hubbard, who was with Hughie and heard this hollering down on the road, states he heard "some fellow talking to George and trying to get him on his mule; heard him ask him if he remembered about him shooting in his house; and his mule got loose and came back when he said that," and that he "never said anything more until he heard some dragging and then some fellow going up the road singing." After hearing this, the Hubbard boys testified that they then got a light and "went down to where they had heard this hollering and dragging," and, as the man had called the fellow George, they hollered "George" once or twice and looked around in the fence corners and then looked and found where somebody had been dragged and then walked on down the road following this sign, to where they found a man lying with the reins of his mule about his neck; that, when they came within four or five feet of him, the mule started back which raised his head up, when one of them grabbed the mule and got hold of the reins and went to untie it, but, finding that difficult, he cut the reins and laid the body back down; that the man was then dead, "with his tongue out of his mouth."

The evidence disclosed that around the first or farthest pool of blood from where the body was found in the road there were many tracks and cross-tracks, indicating that there had been some "floundering around" there, or that the struggle or conflict between these two men they heard had occurred at such place; also their inspection of the road showed that there were large and small mule tracks along it, corresponding in size and shape with those of the large and small mules ridden by appellant and deceased, and that the large mule tracks followed the direction in which the body of Cupps was dragged for about half the distance of the way it was dragged and then turned and went back up the road towards the Allen home. Next appellant complains of the court's admission of evidence showing the appellant never went to see the body of the deceased while it was at Allen's home nearby, despite his protested claims of being one of the deceased's best friends, and also to the testimony that he did not visit the scene of his alleged murder in the highway, where he had that night left him, nor attend his funeral, al-

though he lived within a relatively short distance of it. Of course no duty can be said to have rested upon appellant to visit these places even if a friend of deceased; yet this evidence was competent for the jury's consideration in determining what were appellant's real feelings towards the deceased and as being at variance with his declared sentiment of close and intimate friendship for him. At most it was not substantially prejudicial. The evidence we have thus above summarized, circumstantial though it is, we are of the opinion was not in its effect, equally consistent with the innocence as with the guilt of the accused, and was fully sufficient in its character, probative weight, and volume to sustain and amply support the jury's finding of the defendant's guilt. It became its problem to appraise the weight and the probative cogency of this testimony. It was not required to believe appellant's statement that the deceased and he were the closest of friends or that his feeling for deceased was the very best or that he had left the deceased and Marion Allen, as he testified, in the gateway along the road that evening and had not thereafter ever seen or been with the deceased, but, on the other hand, it was its like right not only to accept and believe the testimony of the witness Marion Allen to the effect that appellant and the deceased had left him at the roadway gate and had together ridden away down this road and around the hill, and that appellant had gone with the deceased, George Cupps, his avowed friend, yet further down the road, even down to the point where the Hubbard boys testified they heard two drunken men hollering, one calling the name of "George" and talking of having shot into his house, and also that he went with the deceased even to where the pools of blood were found in the roadway, marking that as the place of his drunken struggle and tragic death, and further from the detailed circumstances to have found the deceased's death to have been there gruesomely inflicted by the ruthless hands of the appellant.

Appellant's next complaint is that the commonwealth failed to prove the venue of the offense. This contention also we find untenable. This crime, it is clearly shown, was committed just a short distance below the home of Joab Allen, which it was expressly testified, was in Clay county; and also that the home of

the deceased, Cupps, towards which he was going when killed, was in Clay county; while the further evidence is that the place along the road where Cupps was killed was an intermediate point thereon between these homes known as Hammon's hill, which title may designate a well-known place within the county, so that it may be said that, as the jury is not supposed to be ignorant of the location of well-known and named places in the county, here they were familiar, as residents of the county, with the location within it of what was known and called "Hammon's hill." The court and jury, as stated by appellant's learned counsel, may take cognizance of the county in which cities and towns and other well-known places therein are located, without proof aliunde of that fact and that evidence showing the offense was committed in a certain town or city or place well known to country residents is sufficient without further proof of the venue, when such place is located within the county where the venue is charged. The jury, we conclude, was here authorized under such rule to find that this crime, shown to have been committed on Hammon's hill, but a short distance from the homes of Joab Allen and others, shown by the evidence to be in Clay county, had its venue within such county. Bennett v. Com., 242 Ky. 244, 46 S. W. (2d) 84. Further, while it is here shown that Rockcastle river constitutes the boundary line between Clay and Laurel counties and that the appellant, Jasper House, whose home was some two or three miles distant from the Allen home, "lived down the river there in Laurel county and then across to Clay," there is no contention here made that under the evidence there existed any doubt as to the county in which this offense was committed nor is claim made that it was committed across the nearby river boundary line, in Laurel county. Yet, if such doubt existed as to which side of the county boundary line this offense had been committed, appellant's contention would still be here without merit by reason of the provision of section 1146 of Kentucky Statutes, which provides that "when it is a matter of doubt, in the opinion of the court, in which of two or more counties the offense was committed, the court of either in which the indictment is found shall have jurisdiction of the offense." See, also, the case of Fulks v. Commonwealth, 204 Ky. 449, 264 S. W. 1046, 1047, where the court in its opinion, after quoting section

1146 of the Statutes, adds, "The presumption is that the trial court knew its jurisdiction and that the trial was had in the proper county."

The appellant next complains that testimony both incompetent and highly prejudicial was introduced upon the trial against him. However, extending our discussion of this point as hereinabove made as to certain portions of this criticised evidence, it is to be noted that this claim is based rather upon the alleged misconduct of the prosecuting attorney than upon the rulings of the court as to the admission of such alleged prejudicial and incompetent testimony, as appellant by learned counsel admits that the trial court tried very hard to keep out incompetent evidence and in many instances sustained appellant's objections thereto, but that "the commonwealth's attorney paid no heed to the court's rulings but proceeded in getting to the jury matters both incompetent and prejudicial." Thus the appellant by counsel states that the commonwealth's attorney, in an effort to poison the minds of the jury against defendant, persisted, over his objections, which were sustained by the court, in asking Mrs. Cupps, the widow of the deceased, as follows:

"Before your husband's death, I will ask you if Jasper House came to your home and did anything to you or your home?"

To this question the court sustained appellant's objection and directed the commonwealth to "Find out how long before the death of George Cupps he was at her place," to which she answered, "Late last summer, all the neighbors, Buck Philpot and * * * came in and saw him there." The attorney then asked, "How long before the death of George Cupps was he there?" to which she answered, "Seven or eight months." She was then asked, "What did he do if anything when he come there?" to which the court sustained the appellant's objection, and again directed him to find out if George Cupps was there when he (Jasper House) was there, to which question Mrs. Cupps answered, "No sir, I run off when he did that." Also appellant complains of prejudice done his substantial rights by reason of the commonwealth's asking the witness George House if Jasper House had made any threatening statements to him about George Cupps before his death, to which an objection was sustained, when the witness was again

asked if he heard Jasper House say anything about George Cupps prior to his death, to which he answered,. "No sir," when the attorney again, although the witness had answered his question in the negative and the court had sustained appellant's objection, asked again the question, in this manner, "You say you never heard him make any threatening statements about him?" and added, "To refresh your recollection, I will ask you if you did not have a conversation with Jasper House prior to the death of George Cupps and if he did not tell you that he meant to kill George Cupps and the whole damn family, or something like that, in those words or substance?" Appellant's objection to this question was overruled, which appellant contends was both incompetent and prejudicial although the answer given to it was that the appellant had never made any such statements to him.

Without elaborating upon the alleged error of these questions and answers and his objections thereto, made upon the ground that they were both incompetent and prejudicial, whether asked as going to show motive or hostile feeling entertained on the part of the accused against the deceased or for the purpose of showing that threats were made by the accused manifesting such feeling against the deceased just prior to his charged killing of him, we need not here decide, as we are of the opinion that the court's rulings on the same were at most not substantially if at all prejudicial to appellant, and, if any injury to his trial rights was caused, the same arose not from the court's rulings, but rather, as stated by appellant, through the persistence of opposing counsel in not observing and properly heeding the rulings of the court, in which event other procedural remedy was open and available to appellant for his timely protection from prejudice so caused.

Appellant's final contention is that the court erred in its instructions as given, upon the grounds that it gave not only an instruction upon murder, but also one covering voluntary manslaughter, as well as a further self-defense instruction by which appellant's counsel contends the court erred, as he insists that the appellant was here guilty of murder alone, if guilty at all, as there was no evidence upon which to base the other complained of instructions as given. However, a sufficient answer to this contention will be found given

by the court in its opinion delivered in the case of Frasure v. Commonwealth, 169 Ky. 620, 185 S. W. 146, 149, where the court cites with approval the case of Bast v. Commonwealth, 124 Ky. 747, 99 S. W. 978, 30 Ky. Law Rep. 967, from which it quotes as follows:

"Thus it will be seen that in a number of cases this court has held that in instances where there was no eyewitness to the killing, and the evidence is purely circumstantial, it is the duty of the trial court to give to the jury, as said in the Rutherford opinion, all of the law that might be applicable to the case as developed by the facts proven."

Also in the Frasure opinion, supra, the case of Ratchford v. Commonwealth, 28 S. W. 499, 16 Ky. Law Rep. 411, is cited with approval and quoted from as follows:

"No witness saw the killing, and it was said that therefore the homicide might have been excusable self-defense, manslaughter, or murder, and, as it was the province of the jury to ascertain to which category the killing belonged, it was the duty of the court to instruct on the law applicable to murder, manslaughter, and self-defense in order to meet any state of fact the jury might find from the evidence to have existed."

The instructions as here given were likewise meant to cover all phases of the case as developed by the evidence to the end, as stated, that the jury might apply the law as given to any phase thereof which they believed served to connect the defendant with the charged homicide. The criticised instructions here given we find to be substantially the same as found in the cited and numerous other cases approved by this court. While it is true that the appellant did not in this case rely upon the plea of self-defense or that the deceased was killed by him in sudden heat and passion, his plea to the indictment was yet one of not guilty, which put in issue every fact necessary to convict him. Therefore the instruction as here given but conformed with this rule as announced in the cited cases and also Warren v. Commonwealth, 143 Ky. 54, 135 S. W. 409, 410, cited by appellee, where the court, in dealing with like objections there made, said:

"The court instructed on the subjects of murder,

voluntary manslaughter, self-defense, reasonable doubt, presumption of innocence, and insanity. None of the instructions are objected to, except that it is urged that as the defendant did not rely on self-defense, and as there was no evidence tending to support it, it was error to instruct on that point. Perhaps it was; but it was a harmless error, so far as it effected any substantial right of the accused.''

We do not here, however, consider the criticised instructions given as being subject to the criticism made or that same were at all erroneous or that even a harmless error was here committed by the trial court in giving them, as they covered the law and the evidence heard in the instant case.

Such being our conclusion, after a careful review and consideration of the entire record, we are of the opinion that no error prejudicial to the substantial rights of the accused occurred upon the trial, from which it follows that the judgment should be and is affirmed.