## Clemens v. Commonwealth.

(Decided May 8, 1928.)

### Appeal from Livingston Circuit Court.

1. Homicide.—In prosecution of wife for killing husband, amorous letter written to wife by another man held properly admitted, subject to defendant's right to offer such explanation as she desired.

2. Criminal Law.—In criminal trial, possession by accused of incriminating evidence is always admissible.

3. Homicide.—While it is not essential in homicide cases to show motive, evidence tending to show it is at all times admissible.

4. Criminal Law.—In appeal from conviction of manslaughter, that sheriff and deputies on one occasion took the jurors to a game of baseball, where they remained about an hour and a half, held not ground for reversal, where it did not appear that jurors were guilty of any misconduct while there, that the trial was mentioned by any one in their presence, nor that they had any greater opportunity for intimacy than they would have had on the streets.

5. Criminal Law.—In appeal from conviction of manslaughter, held that fact that jurors, who were at boarding house during trial in charge of sheriff, had visited, separately or in pairs, a privy adjoining the street, but were at all times within sight and hearing of sheriff and other jurors, was not ground for reversal, improper conduct not being shown.

6. Criminal Law.—Juror's having clipped newspaper article referring to trial held not ground for reversal, where it was not shown that the article contained objectionable matter, and jury were admonished by court and incident was never repeated.

7. Criminal Law.—In prosecution for murder, showing, relative to the separation of jurors, when 11 of them were taken by sheriff to river for a bath and one was sick and left in bed at hotel, held sufficient to negative improper influence.

8. Criminal Law.—In murder trial, instruction on reasonable doubt given in language of Code, sec. 238, held proper.

9. Criminal Law.—In prosecution for homicide, charge that one of the jurors, who was examined on voir dire and accepted on the panel, had been present at the examining trial and had said that he would like to get on the jury and try defendant, trial court's

absolving such juror from such charge held proper, **in view of contrary showing.**

10.  Homicide.—In prosecution for wife's murdering husband, verdict of guilty of manslaughter held not against weight of the evidence.

C. H. WILSON, C. C. WILSON and J. M. MONTGOMERY for appellant.

J. W. CAMMACK, Attorney General, JAMES M. GILBERT, Assistant Attorney General, and J. R. WELLS, County Attorney (CHARLES FERGUSON, of counsel), for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Affirming.

Mrs. Anna Laura Clemons shot and killed her husband, Alvin Clemens, in their home in Livingston county on the night of March 17, 1927. For this she was indicted, and tried for murder, convicted of manslaughter, and sentenced to the penitentiary for a period of 18 years.

The defendant was born in August, 1900, and was married to the deceased in March, 1917. Prior to that time he had seduced her and they had been living together as husband and wife for several months, and this relation continued after the marriage, a child, Junior, being born to them some two or three years later. Defendant was born and reared in Georgia and there married deceased, who was a traveling salesman. A few years after their marriage they moved to a farm owned by deceased in Livingston county, Ky. Deceased cultivated this during the farming season, but continued on the road during the winter months. His home was not attractive, but in the year 1922 they built a house and moved into it in December of that year. During the winter of 1923 they closed the house and defendant visited her father and mother in Florida, returning about April 1st. She made a second trip to Florida in November, 1925, returning in April, 1926. Prior to the first of these trips she had become acquainted with Russell Chittenden, a bachelor living in the vicinity, and during that visit the two carried on an amorous correspondence that will be noted infra. Later, she and Chittenden became unduly intimate and this continued during the interval elapsing before her next trip to Florida, when the correspondence began again and was continued during her stay at that time. During that visit there seems to have been some estrangement between her and her husband, though no open rupture. After his return in February, 1926, ac-

"cording" to defendant, she showed him the Chittenden letters and told him of her intimacy with Chittenden, and he confessed to like derelictions in certain red light districts, and the two mutually forgave each other and agreed to conduct themselves properly in the future for the sake of their child. At his instance she retained the Chittenden letters, together with those she had received from him. She claims to have thereafter been faithful to her marriage vows. That year passed without any untoward incident, and he made his usual trip the following winter. Before leaving he arranged for Pearl Kimsey, a young lady 16 years of age, to stay with his wife and son, which she did. It appears that these two conducted the affairs on the farm, including a small dairy, and the husband and wife corresponded during this period. Deceased returned in February, 1927, and the parties seem to have been entirely amicable. There is some slight evidence of occasional meetings between defendant and Russell Chittenden during the year 1926, though it is rather indefinite. On the day before the tragedy the defendant called up Miss Sylvester Pugh, a young lady who did housework for Russell Chittenden's mother, to inquire if she desired to attend a dance which was to be held that evening at the home of Harrison Adams, and which was answered in the affirmative. There was a gathering at the Chittenden home that afternoon, and the defendant and Pearl Kimsey attended it and there saw Russell Chittenden, though nothing improper passed between them. They returned home late that afternoon accompanied by Miss Pugh, and after supper deceased, defendant and her little boy, and the two girls attended the dance at the Adams residence about three-quarters of a mile from the Clemens home. This party left about 11:30 p. m. and before the dance broke up, the girls being accompanied by two young men. Upon their arrival the Clemens family entered the house, but the young ladies and their beaux remained on the porch for some 20 or 30 minutes. All of these testify that in the meantime the Clemens family went upstairs. The girls testify that after the boys left they retired in a room downstairs; that the Clemens family had undressed in this room and gone upstairs to bed. It is claimed by defendant: That after she had been asleep for some time the smaller girl, Pearl Kimsey, came running up to her room and awoke her, saying that Mr. Clemens had come to the room below and forced her to

get out of bed and come upstairs and that he had gotten in bed with Miss Pugh. That she jumped out of bed, and as she did so heard Miss Pugh screaming. That she ran down the steps, and as she passed the door there was a double-barreled shotgun standing in the corner. She looked in and saw her husband in bed with Miss Pugh, and the next thing she realized was Miss Pugh screamed and she saw her husband lying on the floor. That she had Miss Pugh to telephone the doctor, and they called Pearl to come downstairs. The three were in their nightclothes, and after telephoning ran out on the road.

Miss Kimsey testifies: That after she had gone to sleep Mr. Clemens came and awoke her and asked her to get up and go upstairs. She told him that she did not want to, and he cursed her and caught her hand and pulled her up. She went upstairs and told Mrs. Clemens and went to bed and went to sleep in Mrs. Clemens' bed. She did not hear the shot, but did hear Miss Pugh screaming. She then went downstairs, and both of them told her that Mrs. Clemens had shot Alvin.

Miss Pugh testifies that after she had gone to sleep in the room downstairs Mr. Clemens awakened her. He had his arms around her and made an indecent proposal to her, which she declined; that she called for Mrs. Clemens; that Mr. Clemens jumped out of bed and started toward the dresser; that witness turned over on her right side and as she did so a gun fired; that she jumped out of the bed and saw Mrs. Clemens standing in the room; that Mrs. Clemens grabbed her by the neck, said she had shot Alvin, and told her to call somebody quick; that she did this, and the three ran down to the road at the mailbox. It is admitted that the three ran to this place and remained until they were joined by some parties returning from the dance, and who claimed to have heard the report of the shot when they were about half a mile away. The women were dressed in their nightclothes and very much frightened. In an incoherent manner they told what had occurred, and a young man went back with them to the house and examined the body of Mr. Clemens, finding life extinct. In the meantime the neighborhood had been aroused, and several came in. Mrs. Clemens frankly admitted to all that she had done the killing, her statements varying in some details from her testimony as given above. A coroner's inquest was held the following day, and a number of witnesses who then examined the premises testified on the final trial that

Clemens' body was lying full length on the floor of the lower room; it was dressed in a union suit, which was buttoned from the neck to the crotch. He was shot in the right breast, and but little blood appeared on the floor where he was lying; much stress being laid upon the fact that the bed in the lower room showed a long indentation on the front side, indicating that it had been made by a large person, while the corresponding indentation in the back of the bed was slight and short, corresponding to that of a child's form; and from which it was inferred that this bed had been occupied by Alvin Clemens and Junior, and that the story detailed by the women was manufactured. Also, both defendant and her principal witnesses were contradicted.

At the conclusion of the cororer's inquest the defendant was arrested and placed in jail, and the brothers of deceased took charge of the premises. These parties rifled her trunk and seized a number of letters addressed to her, some of which were from her husband and two large packages of which consisted of letters clearly identified as being in the handwriting of Russell Chittenden and the same mentioned above. These letters do not intimate any desire to harm deceased, but speak rather friendly of him. However, they are filled with the silly, bombastic mooning of a lovesick swain. They are replete with amorous suggestions and lewd and lascivious proposals, including a hope upon the part of the writer to be legally united with her, together with frequent allusions to the receipt of letters and suggestions from her, clearly indicating that the correspondence was mutual.

This evidence was introduced over her objection and exception, and this ruling of the court is the first ground urged for reversal. There is nothing in the correspondence nor in the other evidence showing a conspiracy between the defendant and Chittenden; hence if the letters are admissible in evidence it must be on the ground of showing a motive for the homicide. A liaison between defendant and Chittenden might have led her to wish for her husband's removal and tempt her to commit the crime of which she was found guilty. None of her answers to these letters is shown, but as they are addressed to her, were admittedly received by her, and retained and preserved by her in the most careful manner, her response to the sentiments expressed in them may be inferred. Differently stated, they afforded some evidence of a motive for the crime. Their introduction as evi-

dence does not make her responsible for what Chittenden said, but merely permits the jury to determine the feel-ings and relationship between herself and Chittenden as reflected by her conduct in retaining and preserving them. The possession of incriminating evidence by the accused is always admissible in criminal trials; and while it is not essential in homicide cases to show motive, such evidence is at all times admissible. It follows that the letters were properly admitted, subject to the right of defendant to offer such explanation as she desired. Wigmore on Evidence, secs, 260, 1073; Jones on Evi-dence, sec. 269; 30 C. J. sec. 437, and cases cited; O'Brien v. Com., 89 Ky. 394, 12 S. W. 471, 11 Ky. Law Rep. 534.

The next ground urged for reversal is misconduct of the officers in charge of the jury. On one occasion the sheriff and his deputies took the jurors to a game of base-ball, and they spent about 1½ hours at the game. It does not appear that they were guilty of any misconduct while there, or that the trial was mentioned by any one in their presence, or that any greater opportunity for in-timacy was offered there than would have been offered by taking the jury upon the streets. It also appears that the boarding house was furnished with an old-fashioned privy, and that the back of this privy was next to the street, and the jurors visited this separately or in pairs, but they were at all times in sight and hearing of the sheriff and the other jurors, and no improper conduct is shown. During the early stages of the trial one of the jurors procured a newspaper and clipped an article re-ferring to the trial from it. It does not appear that there was anything objectionable in the article, and the jury were admonished by the court and this was never repeated. The most serious objection is that one after-noon 11 of the jurors were taken by the sheriff to the river for a bath. One of the jurors was sick and was left in his bed at the hotel in charge of the landlord, who was county judge of the county, and the latter's wife. This separation lasted for less than a half an hour. All of these parties, however, have sworn that no one else was present and that the trial was not mentioned during this period of time. It is true that we have frequently held in capital cases that both the commonwealth and defend-ant are entitled to have the jurors absolutely protected from outside interference, and that if a separation of jurors occurs the burden is upon the commonwealth to show by clear and convincing evidence that no opportun-

ity was afforded.for tampering with any of them, and unless this is done the verdict cannot be upheld. But when as in this case the evidence of reliable and trustworthy witnesses covers all the period of separation and shows affirmatively both the absence of tampering and the absence of opportunity, we cannot say that defendant's substantial rights have been prejudiced. Adkins v. Com., 197 Ky. 385, 247 S. W. 26, and cases there cited.

The court gave instructions on reasonable doubt in the language of the Code provisions, section 238. In a number of cases we have held this to be proper. In answer to long hypothetical questions by counsel for defense, in which his theory of the case was fully developed, Dr. H. B. Sites testified:

> "If the statement of the hypothetical question is true I would think she did not have judgment enough to know between right and wrong."

And in response to the same question Dr. W. M. Elliott, gives it as his opinion that "she was insane." Upon this the court gave an instruction on insanity which was as favorable as defendant could ask.

Appellant filed the affidavit of Ed Bauer to the effect that E. N. Holdman, one of the jurors, who was examined on the voir dire and accepted on the panel, had been present at the examining trial and had told him that he would like to get on the jury to try defendant. This was denied by Holdman and several others, who stated that E. N. Holdman was not present at the examining trial, though his brother was present at that time. The circuit court absolved the juror, and as he was acquainted with the parties and able to determine their credibility we cannot say this was error.

Appellant admits killing her husband, and for this she offers no excuse. She was accorded the defense of insanity in a favorable instruction, and this defense was rejected by the jury. The only mitigation urged is that of provocation caused by the discovery of her husband's infidelity. The jury must have considered this, as they found her guilty of manslaughter only. True the punishment is for a long period of time, and it may be that the jury did not regard the provocation as being of heavy import; but they were the triers of fact. The facts were fully presented and the law fairly given to them, and we are unable to say that the verdict was flagrantly against the weight of the evidence. And upon a consideration of

the entire record we do not think the defendant's substantial rights have been prejudiced.

Finding no reversible error in the record, the motion of the commonwealth to strike the transcript of evidence and disregard the bill of exceptions for certain irregularities appearing therein have not been considered or passed upon.

Wherefore, perceiving no error, the judgment is affirmed.