# Payne v. Commonwealth.

(Decided Oct. 2, 1934.)

534

HUBERT MEREDITH for appellant.

BAILEY P. WOOTTON, Attorney General, and DAVID C. WALLS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Affirming.

Effie Payne has been convicted before a jury of the crime of murder and her punishment fixed at confinement in the reformatory for life.

The instructions of the court confined the jury to the crime of murder. No instructions were given on manslaughter and self-defense. The indictment charged the crime was committed by the deceased being struck and killed "with a blunt instrument—a deadly weapon." It is insisted instruction No. 1 is erroneous "because the question of whether the so-called club was a deadly weapon should have been submitted to the jury." To sustain this insistence she cites to us Owens v. Commonwealth, 187 Ky. 207, 218 S. W. 719; Burgess v. Commonwealth, 176 Ky. 326, 195 S. W. 445; and Cheatham v. Commonwealth, 228 Ky. 765, 15 S. W. (2d) 525.

It is strenuously urged that the facts in this case bring it within the rule, where there is no eyewitness to a killing the court should give to the jury instructions on manslaughter and self-defense. Illustrative of it see Brown v. Commonwealth, 117 Ky. 766, 78 S. W. 1126, 25 Ky. Law Rep. 1896; Frazier v. Commonwealth (Ky.) 114 S. W. 268; Little v. Commonwealth, 209 Ky. 263, 272 S. W. 721; McClerkin v. Commonwealth, 221 Ky. 680, 299 S. W. 570; Messer v. Commonwealth, 90 S. W. 955, 28 Ky. Law Rep. 920; Fletcher v. Commonwealth, 239 Ky. 506, 39 S. W. (2d) 972; Bast v. Commonwealth, 124 Ky. 747, 99 S. W. 978, 30 Ky. Law Rep. 967; Frasure v. Commonwealth, 169 Ky. 620, 185 S. W. 146; McGee v. Commonwealth, 246 Ky. 445, 55 S. W. (2d) 382; and Cox v. Commonwealth, 158 Ky. 435, 165 S. W. 411.

It is also argued the verdict is not supported by the evidence and so given under the influence of passion and prejudice. Incompetent evidence is complained of, and, lastly, it is argued, the defendant was convicted on "perjured testimony" when "the immense throng that

packed the court house and their hostile attitude toward the appellant and her defense throughout the trial, prevented her from having a fair trial of her case." A resume of the evidence is required correctly and fairly to dispose of these questions.

The accused, Effie Payne, and Joe Payne, were husband and wife, both of them were married before their marriage to each other, she having a son by her former husband and he two sons by a former wife. Their sons lived with them, that of Mrs. Payne being twenty, and the sons of Joe Payne thirteen and sixteen, years of age. Irene Perry and Ruby Nell Mathis, young girls, had been in the home of the Paynes for about four weeks before the death of Joe Payne. J. D. Ortkies was working at their home and spent the night during which Joe Payne was killed. H. G. Watkins, Estil Crittenden, and Felix Puryear were at the home of the Paynes between 10 and 12 o'clock on the night of the killing, but they left the Payne home around midnight, leaving Effie Payne, Joe Payne, Joe Payne's two children, Raymond Higgs, the son of Effie Payne, J. D. Ortkies, Irene Perry, and Ruby Nell Mathis. Joe Payne was, at the time of their departure, on the front porch of the home, "about half drunk." Murile Payne, a sixteen year old son of Joe Payne, testified that he and his younger brother went to bed about 9 o'clock and went to sleep, but he awoke and came back into the room and remained until about 12 o'clock, when he and Raymond Higgs went to bed, leaving his father, Effie Payne, J. D. Ortkies, Irene Perry, and Ruby Nell Mathis about the house. He stated that about fifteen or twenty minutes before he went to bed Joe Payne was walking around, going toward the road in the direction of the garage. He was in the road when he last saw him.

J. D. Ortkies testified that he was working for Mrs. Payne; he arrived at her home about 6 o'clock, stayed until 10 o'clock, when he and Joe Payne went to Perry's drug store, where Payne purchased two packages of cigarettes, when they returned, within a few minutes, where he remained until around 12 o'clock, when he was called by Raymond Higgs. Ruby Nell Mathis testified that around 11 or 12 o'clock she and Irene Perry went to bed, and thereafter "sometime between twelve and one o'clock" Mrs. Payne "got out of the bed," "came through," "turned the radio on loud," and went out on

the porch. "Mrs. Payne had gotten up and gone on the porch" when she (Ruby Nell Mathis) "got up" and "went to the window," "the front window looking out on the front porch."

At this point she was asked and answered as follows:

"Q. Did you see anybody on the front porch? A. Yes, sir.

"Q. Whom did you see? A. I saw Joe Payne lying on the porch.

"Q. Lying on the porch? A. Yes, sir.

"Q. Did anything happen there on the porch? A. I saw Effie Payne hit him twice.

"Q. Saw Effie Payne, the defendant here, hit Joe Payne? A. Yes, sir.

"Q. What did she hit him with? A. I don't know, it looked like a club.

"Q. Looked like a club? A. Yes, sir.

"Q. Do you remember what part of his body she struck? A. She struck him in the head.

"Q. Now after she struck him in the head with this club, did she do or say anything? A. Yes, sir.

"Q. What did she say or do? A. She called Raymond Higgs.

"Q. Called Raymond Higgs? A. Yes, sir.

"Q. What did she say to Higgs? A. Told him to help take him to the car.

"Q. Told him to help her take Payne to the car? A. Yes, sir.

"Q. What did Higgs say? A. He told her he wouldn't do it.

"Q. When he told her he wouldn't do it, what did she say? A. She would lay it on him.

"Q. Told him if he didn't take him to the car she would lay it on him? A. Yes sir; that was when I was up.

"Q. Well, did they put him in the car? A. I don't know; they went off of the porch with him.

"Q. They went off of the porch with him? A. Yes, sir.

"Q. What did you do then? A. I went to bed.

"Q. Did you tell anybody about it that night?
A. Yes, sir.

"Q. Whom did you tell? A. I told Irene Perry."

She further testified that about 4 o'clock in the morning she heard Raymond Higgs call J. D. Ortkies and tell him to get up. At the same time Mrs. Payne got up, and, in response to her question, stated "they were going out to hunt Joe; that he hadn't been in all night." At that time Mrs. Payne was dressed in "an orange gown." The next morning she (Ruby Nell Mathis) examined the gown and there were "some stains on it that looked like blood;" "blood stains right up around the hips.".

Irene Perry corroborated Ruby Nell Mathis except as to what the latter saw while she was at the window, looking out on the porch, and also except as to the blood on the gown.

J. D. Ortkies further testified thus:

"Around twelve o'clock, I was in the house and Raymond Higgs called me and said, 'do you want to go with me to get three gallons of whiskey?' and I said, 'no, I was working for Mrs. Payne and she might not want me to go.' I said, 'you see her and if she says I can go I will go;' so in a few minutes he came back and said, 'Ma said I could go with him,' and I went out and got in the car; we drove at least a mile, turned out this road toward Martwick, and I said, 'where are you going?' and he said he was going to the first hollow, and he went on down there below Young's school house and turned around." "After he got to Young's school house, after he stopped the car, he went around and pulled the door open and said 'help get this God damn son of a bitch out of here,' so when he said help get him out I looked around and seen who it was and I said, 'no,' and he jerked him out and struck him in the head three times with a car tool." At that time Payne "had a blanket or something over his head; he had a hole there that looked like he had been struck across the head hard with something or other." Raymond Higgs jerked the blanket off, "threw it in the back end of the car, picked up that car tool off of the front floor and struck him three times," "in the head"; "then threw the car tool on the front floor, got

back in the car, drove it back and put it in the garage." On returning to the Payne home, Ortkies claimed he went to bed and remained until about 4 o'clock in the morning when Raymond Higgs called him, and "said he wanted to go to town to get some gasoline," so he could "clean this blood off of the car." They went in the car to town, obtained gasoline, then went out the road "toward Kincheloe's Bluff." Raymond Higgs took a bunch of rags out of the car and cleaned the blood out of it; burned the rags; took out the floor mat in the front and also in the back of the car, and burned them. He testified that at the time he and Raymond Higgs went to the garage and got in the car, before carrying the body of Joe Payne to the point where it was dumped, the car was backed into the garage so as to leave the front of the car toward the exit.

About a week before the death of Joe Payne, Raymond Higgs was intoxicated and Joe Payne whipped him. Thereafter Raymond Higgs declared to Joe Payne's children he would get even with him (Joe Payne); that he would take him on a ride from which he would not return.

Lofton Grayson testified that he, Albert Beck, and J. D. Ortkies were at the home of Joe Payne about three weeks before the latter's death, when he heard Effie Payne offer Albert Beck and J. D. Ortkies $1,000 insurance if they would kill Joe Payne; she stated to them she had the insurance at that time.

J. D. Ortkies testified that this proposition was made by her to him and Beck. Beck, in his testimony, emphatically denied the story. A few witnesses testified to minor and unimportant threats of Joe Payne by Effie Payne.

An inquest was held on the morning following Payne's death by the coroner about one mile from the home of Joe Payne on the road called Young's, near the bridge over the Drakesboro pike. It disclosed that Payne's skull was crushed "pretty deep" in "as many as four places," "one at the base of the skull," "a hole all torn in his forehead," which was "the heaviest blow made"; "it left a hole there." It was the opinion of the coroner and undertaker "those wounds were sufficient to produce death." They had been made with a "blunt instrument," "some hard instrument, hatchet or

something." "They were deep"; "his little finger on the left hand was broken"; "he had bled profusely." There were "several cut places on his head and face, both sides of his face—both cheeks, chin, forehead, top of his head, back of his head and his right ear." There were no gunshot wounds in his body.

A number of witnesses testified that on the morning of the day Payne's body was found, and during that day, they examined the front porch of the home · of Payne and found no blood on the porch floor. The chief of police of Central City, about 8:30 o'clock of the morning Payne's body was found, examined the premises of the Paynes including the space around the wash kettle that was used for the purpose of the home, and found nothing; but the next morning he re-examined the same, and found "a piece of blanket about the size of the hand," and "a piece of black silk." They were found by him "about five feet on the far side of the wash kettle at Joe Payne's home"; there was "blood on them" and they were "kinder scorched," but the blood on them could be seen.

Mrs. Payne's defense is an unequivocal denial and a declaration that she had no information or knowledge as to how Joe Payne came to his death. She admits wearing on that night the orange-colored gown and the presence of blood on it, but asserts the blood came from her own person. Her son, Raymond Higgs, did not testify. Ruby Nell Mathis and Irene Perry were confined in jail immediately after the killing. Irene Perry, at the request of Ruby Nell Mathis, wrote an exceedingly endearing letter, containing extravagant statements of the latter's love for J. D. Ortkies, who was also confined in jail, and, in addition to this, engaged in conduct expressive of the intensity of her admiration of him. Higgs, Ortkies, and Mrs. Payne were charged with the killing of Payne. And on their examining trial Ruby Nell Mathis testified she had no knowledge or information of who killed Joe Payne, and positively declared she saw and heard nothing on the night he was killed, connecting Mrs. Payne and the others with the act of killing. It will be observed that her testimony on the trial of Mrs. Payne positively identifies the latter with the act of the killing of Payne.

Mrs. Payne argues that "from the testimony, two propositions are quite clear, viz. [1] Effie Payne was not present with the body of Joe Payne at any time

after the witness [Ruby Nell Mathis] says he was carried from the porch immediately following the two licks, * * * and [2] these two licks did not kill him because his head was beaten with a metal tire tool used by Ortkies and Raymond Higgs subsequently thereto after he had been removed from the Payne home, * * * Effie Payne was not present on either of the latter occasions and did not participate in what occurred. The licks claimed to have been administered to him by Mrs. Payne did not break the skin or cause Payne the loss of any blood. This is made plain by several disinterested witnesses who examined the porch thoroughly and found not a blood spot on it, * * * the licks that produced his death did not break the skin and make the frightful wounds from which much blood was lost.'' This insistence overlooks the testimony of the undertaker, the coroner, and Ortkies. The testimony of Ortkies is that Raymond Higgs pulled Joe Payne out of the car and struck him thrice with the automobile tool. Before he was pulled from the car, a blanket or something was over his head. There was a hole in his head at that time.

The testimony of Ortkies is corroborated by the coroner and undertaker wherein they testify there was a hole in his forehead, and establishes beyond doubt that, if Payne was not dead at the moment he was pulled from the car, he was mortally wounded from which he immediately died. The three strokes on the head with the car tool in the hands of Raymond Higgs did not produce the mortal wounds or all of them described by Ortkies, the undertaker and the coroner. According to the testimony of Ruby Nell Mathis, at least two of them were inflicted by Effie Payne on the porch at the home of Joe Payne, from which he was carried while in a helpless condition and placed in the car at the garage. The testimony of Ortkies corroborates that of the coroner and undertaker. It is undoubtful that at the moment he was jerked or pulled from the car by Higgs Payne was mortally wounded, if not dead. If one willfully and with malice aforethought mortally wounds another with a deadly weapon, the fact another immediately thereafter unlawfully, willfully, and maliciously inflicts a distinct wound, whether of itself mortal or not, on the wounded person, and thereby accelerates or hastens his death, both are guilty of murder. Hopkins v. Commonwealth, 117 Ky. 941, 80 S. W. 156, 25 Ky. Law Rep. 2117, 4 Ann. Cas. 957. The terms ''mort-

ally wounded" and "mortal wound," as here used, means "deadly," "death-producing," and is defined by Webster as "destructive to life, causing or occasioning death." State v. Baker, 122 Kan. 552, 253 P. 221. The acts of Effie Payne as described by Ruby Nell Mathis, corroborated by the wounds on the head of Joe Payne, and his profusely bleeding before he was jerked or pulled from the car and struck with a "car tool," leave no doubt the wounds inflicted by her were mortal and were sufficient to warrant the submission of the case to the jury on the question of her killing him with a blunt instrument.

In a number of cases where an indictment under section 1166, Kentucky Statutes, charged the defendant with the crime of willfully and maliciously striking another person with a deadly weapon with intention to kill, we have held it proper to define the term "deadly weapon." Owens v. Commonwealth and Burgess v. Commonwealth, supra. In Cheatham v. Commonwealth, supra, the charge was murder, and the court instructed the jury that, in order to convict the defendant, it must believe he hit the deceased with some deadly weapon, and defined the term "deadly weapon." There the accused complained because the instruction did not tell the jury what did not amount to a deadly weapon. It is nowhere intimated in the opinion that the failure to define a deadly weapon in such case is a reversible error. The rule and the reason for it as stated in Owens v. Commonwealth and Burgess v. Commonwealth and other cases do not apply and control in the case of homicide.

In every case of homicide the material inquiry is whether the killing was done with malice and the intent to kill and in the manner by or through which it was done, whether the implements used were deadly weapons or not. Maulding v. Commonwealth, 172 Ky. 370, 189 S. W. 251. The reason for this rule is, one must be presumed to intend the consequences of an act reckless in its character of human life and committed under circumstances calculated to endanger it. If death results, and if the act producing it is willfully and maliciously committed, it is wholly immaterial whether the implements used, which produced death, were deadly weapons or not; the crime is murder.

The court properly failed to define the words "blunt instrument," as they are used in the indictment and the instruction.

The facts herein do not bring this prosecution within the rule (Rutherford v. Commonwealth, 13 Bush. 608):

"When no witness saw the homicide committed, or the parties on the occasion when the kililng occurred, the law applicable to murder, manslaughter, and self-defense should be given in order to meet any state of fact the jury may find, from the circumstances in evidence, to have existed."

This rule does not make it the duty of the court in every case of homicide to instruct as to murder, manslaughter, and self-defense. Instructions must be based upon the evidence and given to suit the case in hand. Where the facts and circumstances establish the crime is murder or nothing, although no eyewitness was present, the court is not required to give murder, manslaughter, and self-defense instructions. O'Brien v. Commonwealth, 89 Ky. 355, 12 S. W. 471, 11 Kv. Law Rep. 534; Bast v. Commonwealth, 124 Ky. 747, 99 S. W. 978, 30 Ky. Law Rep. 967; Kirk v. Commonwealfh. 192 Kv. 460, 233 S. W. 1060; Foster v. Commonwealth, 112 S. W. 563, 33 Ky. Law Rep. 975; McElwaine v. Commonwealth, 154 Ky. 242, 157 S. W. 6; Frasure v. Commonwealth, 169 Ky. 620, 185 S. W. 146, 150; Hunter v. Commonwealth, 171 Ky. 438, 188 S. W. 472; Minniard v. Commonwealth, 158 Ky. 210, 164 S. W. 804; Morgan v. Commonwealth, 242 Ky. 116, 45 S. W. (2d) 850.

As was said in Frasure v. Commonwealth, supra: "We can readily see that, if the evidence is entirely circumstantial and only established the corpus delicti, and other circumstances from which it might be inferred that the defendant had some connection with the crime, he would be entitled to the instructions contended for out of due regard for human life and liberty. The law has extended to him this privilege, but it has never been carried further. On the contrary, it has been determined in a number of cases from this court that, where the record presents no room for any possible theory except that of murder or innocence, there is no room for a manslaughter or self-defense instruction."

In the present case it was shown that the accused left her bedroom and went to the front porch, and the

witness Ruby Nell Mathis, observing her leaving her room, arose, went to the window, and saw the body of Payne lying on the porch, and the accused in the act of striking him, and she did strike him with ''a club.'' Payne was on the porch half drunk a short period of time prior to this occurrence. No noise was heard indicating a struggle between him and the accused; she had on an orange-colored gown; it was not torn nor otherwise bore evidence of a struggle or combat. Her defense is she had nothing to do with the killing and the act was committed by another person. The evidence does not bring this case within the rule:

> ''Where evidence is purely circumstantial and indicates struggle, court should instruct on every phase or degree of offense, including self-defense and manslaughter.''

Fletcher v. Commonwealth, 239 Ky. 506, 39 S. W. (2d) 972, 974. The testimony of Ruby Nell Mathis was the only evidence that connected Effie Payne with the commission of the crime charged in the indictment. On cross-examination she admitted that at the examining trial of Effie Payne and her co-defendants ''she had made no mention of any facts connecting her with the crime; that she did not get up after she went to bed.'' Also that she had changed her testimony since the examining trial; she had had Irene Perry to write for her a letter to J. D. Ortkies; talked to him and had kissed him through the bars of the jail where they were both confined.

It is contended that the testimony of this witness ''was perjured'' and it prevented Effie Payne from having a fair trial.

The jury had before it the whole of the evidence as well as her exonerative admissions as to her testimony on the examining trial, and it was exclusively its province to believe and determine whether she told the truth in her testimony before it, or her testimony on the examining trial was the truth. On her conflicting statements it was for it to say by its verdict whether it believed from the evidence beyond a reasonable doubt Effie Payne was guilty of the crime of murder. Nor was it confined to believing no blood was on the floor of the porch immediately or next morning after he was struck by her with a blunt instrument. It was entirely

unnecessary for the commonwealth to explain the absence of the blood on the porch floor to secure, or warrant, a conviction. This was a fact favorable to, but did not exculpate, Effie Payne.

The credibility of the witnesses and the weight that should be given their testimony are always questions for the jury. This court cannot regard only the testimony of the accused and her witnesses, and reverse on the ground of the insufficiency of the evidence. Hopper v. Commonwealth, 250 Ky. 405, 63 S. W. (2d) 467; American Mutual Liability Ins. Co. v. Hartman, 254 Ky. 712, 72 S. W. (2d) 429. It is a perfectly familiar rule that this court will not disturb the verdict of a jury on facts unless it is palpably against the evidence. Meek v. Commonwealth, 249 Ky. 134, 60 S. W. (2d) 360; Lee v. Commonwealth, 250 Ky. 421, 63 S. W. (2d) 483; Jones v. Commonwealth, 250 Ky. 217, 62 S. W. (2d) 56, and cases cited.

The accused in her brief states:
"The vast throng [in the court room] made apparent their feeling that Effie Payne was guilty during the entire progress of the trial. The affidavits [herein] disclose the ways and manner in which the crowd demonstrated its hostility to the defendant on trial. No matter what anyone else may say, I know that these affidavits are true"

"The affidavits disclose there were numerous newspaper articles published and circulated throughout the county where the accused was tried, depicting in rather extravagant terms the horrible and brutal manner in which Joe Payne was murdered. As a consequence and natural and direct sequence of the publicity, the talk and newspaper articles together with the brutal manner in which Joe Payne was murdered, the public was greatly inflamed against the defendant and those who were jointly indicted with her." This prevalent feeling caused the greatest crowd to be attracted that ever had attended a public trial in this county; it filled and crowded "the court room, galleries, doorways, aisles and elsewhere to the limit during the trial." "The court and his officers were unable on account of the size of the crowd and its hostile attitude toward her, to control its members and to suppress their emotions and expressions." It is further stated in the affidavits that members of the crowd "smiled derision to the defense

of the defendant, * * * and that such a condition was so prevalent as to impress the jury with the feeling of the crowd.'' The law requires that an accused shall be given a public trial, but it makes no provision as to the number that shall or shall not attend the trial. Carsons v. Commonwealth, 243 Ky. 1, 47 S. W. (2d) 997. Therefore, only such conduct of the bystanders, if any, as was calculated to influence improperly the jury in the consideration of its verdict, may be complained of by a convicted defendant.

The record discloses that, when the letter of Ruby Nell Mathis to Ortkies was read, and also when she admitted kissing him through the bars of the jail, some of those present indulged in laughing. Such was to be expected and was inevitable. This is the only act of indecorum of the bystanders reflected by the record other than that disclosed by the affidavits in support of the motion and grounds for a new trial. The affidavits are no more than a mere expression of the opinion of the affiants that the verdict of the jury was influenced by the presence and alleged conduct of the crowd. The fact the lowest penalty for the crime of murder was imposed by the verdict of the jury affects the weight of the opinions of the affiants. In the circumstances, we are not convinced the accused was not afforded a fair and impartial trial because of the presence and conduct of the crowd as described in the affidavits supporting the motion for a new trial.

Newspaper publicity dealing with the crime for which an accused was tried has been frequently dealt with by this court. It has been uniformly held such publicity entitled the accused neither to a continuance nor a change of venue. There must be evidence other than, and independent of, newspaper articles, showing the condition of public sentiment in the county, and for that cause he had been deprived of a fair trial at that term of the court, or in the county where the prosecution occurred. Mansfield v. Com., 163 Ky. 488, 174 S. W. 16; Clemens v. Com., 224 Ky. 370, 6 S. W. (2d) 483; Carsons v. Com., 243 Ky. 1, 47 S. W. (2d) 997.

The accused neither before the commencement of the trial nor during its progress made known to the court any claim the newspaper articles, the state of public sentiment, or the presence of the large crowd, or its conduct, in any manner, would or was interfering

with, or preventing, her receiving at the hands of the jury a fair and impartial trial. The affidavits admitted she had knowledge of the newspaper articles and the presence in the court room of the immense crowd, its hostility to her and her codefendants both before and during the progress of the trial. To permit her to rely thereon after the return of an adverse verdict as a ground of a new trial, or a reversal, would be equivalent to condoning her willingness to speculate on the verdict of the jury, and, on it being adverse to her, accord relief from her own acquiescence. No presumption exists that the jury was influenced by the state of public feeling in the county or the presence or the conduct of the by-standers when it rendered its verdict finding the defendant guilty of murder. Gray et al. v. Com., 252 Ky. 830, 68 S. W. (2d) 430.

Certain statements of a few of the witnesses were objected to during the progress of the trial. We are not convinced that the questions propounded to and answered by the witnesses to which objections were made were incompetent, except those relating to the previous marriages of the accused and the whereabouts of her former husbands. Admittedly, such evidence was incompetent, though not prejudicial.

Entertaining no doubt as to the sufficiency of the evidence and perceiving no error of record, the judgment is affirmed.