## Higgs v. Commonwealth.

(Decided Oct. 2, 1934.)

548

HUBERT MEREDITH for appellant.

BAILEY P. WOOTTON, Attorney General, and DAVID C. WALLS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

The appellant, Raymnod Higgs, Effie Payne, and J. D. Ortkies were jointly indicted by the grand jury of Muhlenberg county for the murder of Joe Payne. Separate trials were awarded Raymond Higgs and Effie Payne, and each was convicted and sentenced to the state reformatory for life. The facts and history of the case and the law applicable thereto are substantially the same in each case, all of which are fully set out in the case of Effie Payne v. Commonwealth, 255 Ky. 533, 75 S. W. (2d) 14, this day written, and it would serve no good purpose to give a detailed statement of them in this opinion. The Effie Payne Case, supra, is referred to for that purpose.

The deceased, Joe Payne, and Effie Payne were husband and wife, and each had previously been married, and the appellant, Raymond Higgs, is the son of Effie

Payne by her former husband, and Joe Payne had two sons by his former wife, all of whom lived together and occupied the same home where the killing occurred.

On the night of the killing, a number of people were at the Payne home, all of whom left at various times up to about 12 o'clock, leaving in the home the deceased, Joe Payne, and his sons, Irvin Payne and Muriel Payne, J. D. Ortkies, Raymond Higgs, and two hired girls, Ruby Nell Mathis and Irene Perry. They were selling beer at the Payne home and perhaps indulging in other intoxicating drinks, and the deceased, Joe Payne, was drunk or intoxicated. He was last seen by the neighbors, who left about 12 o'clock, on the front porch. Muriel Payne, 16 year old son of Joe Payne, testified that he saw his father at about 11 o'clock on the front porch; that he was intoxicated, but not injured in any way. He testified that he and Raymond Higgs went to bed about 11 o'clock, but that Higgs was not there when he got up about 6 o'clock the next morning. Estil Crittenden stated that he saw Joe Payne on the front porch about midnight and that he was not injured or wounded in any way; that he never saw him any more, and heard the next morning that he was dead. When he left the Payne home about 12:30 or 12:40 o'clock, he saw no one except Higgs and his mother, Mrs. Payne, who were in the room adjoining the porch. Ruby Nell Mathis testified that she and Irene Perry went to bed in the same room together at about 12 o'clock, and about 1 or 1:30 o'clock "somebody turned the radio on as loud as it would go," and she heard somebody go out on the porch; she got up and went to the window and saw Joe Payne and Effie Payne on the porch. A little while after that she saw Effie Payne and Raymond Higgs carrying Joe Payne off of the porch, but she did not know where they went. Some time after that she heard Effie Payne call Raymond Higgs, and later she heard Raymond Higgs call J. D. Ortkies, and soon thereafter she heard an automobile leave.

Irene Perry corroborates Ruby Nell Mathis respecting the radio and hearing some one on the front porch, but she did not get up and go to the window or see any one on the porch. J. D. Ortkies, who was in the Payne home and working for Mrs. Payne, testified that he retired about 12 o'clock and never saw or heard anything

until about 4 o'clock the next morning, when Raymond Higgs called him on the outside of the house, and Higgs said:

"'I want to get you to take a little drive, about twenty minutes,' I said, 'Alright, it's owning to what Ma said (meaning Mrs. Payne) that I was working for her' and he said, 'It would be perfectly alright with Ma,' and so directly she come in and I asked her and she said 'Alright' she just kinder looked up to me and frowned—that was all that was said, so Raymond called me and said he was going to Ollie Ortkies' to get three gallons of whiskey, but when he got to the lane he didn't stop."

He further stated that, when they got to the first road on the right, Higgs stopped the car and said:

"'Help me get this G—— d—— son of b—— out of here.' I asked him who it was and he said it was Joe Payne and I looked back and just took hold of the man's hand and saw who it was and I said 'No.'"

He stated that Payne was doubled up in the back of the car and he did not know that he was in the car until that time; that he took hold of Payne's hand and that he was warm; that he refused to help take him out of the car. Higgs took hold of him and took him out of the car by the feet and pulled a blanket off and threw it in the back end of the car and reached around in the front of the car and got a car tool and struck him (Payne) in the head three times with the car tool. He described the car tool as being a piece of iron, "about this long" (indicating) and was a square piece of iron. He was asked whether Higgs hit Payne easy or hard and he answered: "Looked like it was as hard as he could.

"Q. Did Joe say anything? A. Just grunted a little bit the first lick. The other two licks I never heard anything."

After this Higgs pitched the car tool on the front floor of the car and got back into the car and they drove back to the house and put the car in the garage. He further stated that on the next morning Higgs called him to go down town and they went to the Shell Station and got three gallons of gasoline there and drove to the

Coca-Cola Bottling Company, and got another gallon of gas at McDowell Bros. to clean the blood out of the car, and, after he cleaned the car the best he could, he took up the back floor mat and burned it with a bunch of rags that he had used in cleaning the car.

On cross-examination the witness Ortkies admitted that, when he was arrested on the charge, he denied all knowledge of the death of Joe Payne. There was blood found on his clothes, and he told the officers that he had killed some chickens for Mrs. Payne the day previous and that it was chicken blood. An analysis of the blood was made, and it was determined to be human blood, and then he opened up and told the whole story as above indicated. He offered as an explanation why he first denied knowledge of the crime that he was afraid to tell it; that the boy (meaning Higgs) told him he would do him "the same way or see that it was done."

The undertaker and funeral director and others who saw Payne after he was killed testified that his skull was crushed in different places, as many as four or five, any one of which was sufficient to produce death. There were a number of other cuts and minor wounds about his face and head, and the little finger of his left hand was broken, but none of these minor wounds was sufficient to produce death.

At the close of the testimony for the commonwealth, counsel for Higgs moved for a peremptory instruction which was overruled by the court. It is obvious from the above resume of the evidence that the court properly overruled this motion. The evidence is not only sufficient to carry the case to the jury, but is also sufficient to sustain the verdict.

Higgs did not testify in his own behalf. He offered to prove by other witnesses that the reputation of the commonwealth's witnesses Ruby Nell Mathis and Irene Perry for chastity and general moral character was bad. The court sustained objections to the question, and admonished defense counsel to confine his questions to the reputation of the witnesses for truth and veracity. This ruling of the court was erroneous. The defendant should have been permitted to impeach the witnesses in the manner offered. Section 597, Civil Code of Practice. But in the circumstances we do not think that the error was prejudicial to the substantial rights of the defendant, inasmuch as there was other substantial testimony

and an eyewitness to the alleged killing of Payne by Higgs. The evidence of Irene Perry was not very damaging to defendant. She only stated that she heard the radio and some one on the front porch, but she did not state that she saw defendant at the time. The witness Ruby Nell Mathis stated that she saw the defendant and his mother, Effie Payne, carrying Joe Payne from the porch, but she did not state that she saw defendant strike Payne or otherwise harm him. Were the evidence in this case merely circumstantial and no eyewitness or other substantial evidence against the defendant, in such event the evidence of the two girls above referred to might be considered of more importance, and the error of the court in refusing the impeachment of their testimony as offered might have been substantially prejudicial. But whether or not the jury believed the testimony of the Mathis and Perry girls, the evidence of the eyewitness, J. D. Ortkies, and other circumstances, was sufficient to support the verdict of the jury. In view of all the substantial testimony in the case, it would indeed be unreasonable to conclude that the jury would have acquitted the defendant but for the failure of the court to permit the impeachment of the witnesses as offered. However, it is argued for appellant that the testimony of the girls whom he offered to impeach was important because it was the only testimony tending to corroborate Ortkies, whom they claim was an accomplice, and that his testimony alone was insufficient to convict the appellant in the absence of corroborative evidence. Appellant is in error in this contention, because Ortkies, as shown by this record, was not an accomplice. The mere fact that he was jointly indicted with appellant and others did not constitute him an accomplice, in the absence of any testimony tending to connect him with the crime. He denies having any connection with the killing of Payne, and there is no evidence of any witness tending in the least to connect him therewith. Had it been established that he was an accomplice, a different case might be presented. It is also shown by the evidence that about two weeks before the killing Raymond Higgs, the appellant, came home drunk and disorderly, and Joe Payne, the deceased, whipped him, and appellant said that he would "get even with him." This threat, if the jury should have considered it a threat against the deceased, fur-

nishes a motive on the part of appellant to kill the deceased, if he did do so.

It is argued for a ground for reversal that the court erred in not defining to the jury the meaning of the words "deadly weapons." The witness Ortkies testified that appellant struck the deceased three times in the head with an iron car tool. Results of these wounds rendered it unnecessary for the court to define the words "deadly weapons." In cases of homicide, where death immediately follows the infliction of the wound, it is unnecessary to define to the jury the meaning of the words "deadly weapons." Effie Payne v. Commonwealth, supra, and cases cited therein, and Mawling v. Commonwealth, 172 Ky. 370. Another ground urged for a reversal is that the jury, while under guard of the sheriff, was permitted to be separated for short spaces of time about a barber shop. The only record we find of this complaint is in the motion and grounds for a new trial, which is not supported by any affidavit or other evidence, and it is unnecessary to consider this question, for the reason there is no evidence to support it. It is next argued that appellant's application for a change of venue should have been granted. Evidence was taken on this motion, but an examination of the evidence convinces us that there was no sufficient reason shown for a change of venue, and the denial of same by the trial court was proper.

The further complaint is that the closing argument of the commonwealth's attorney to the jury was prejudicial. The statements of the commonwealth's attorney complained of are: That in referring to Mrs. Payne calling the appellant, he gave it as his version that she called him "to go out and obliterate the blood stains upon the car," when in fact the testimony was that she called him to go out and hunt for Joe Payne. No doubt the commonwealth's attorney meant to state his version or interpretation of the purpose of the call; i. e., that she wanted him to obliterate the blood stain in the car instead of hunting for Payne. Another statement by the commonwealth's attorney complained of was that he made some reference to appellant being charged with using the girls, Mathis and Perry, for financial gains. The court admonished the jury not to consider that statement. The commonwealth's attorney then made some reference to appellant's mother, Effie Payne, keep-

ing the girls there for financial gains, and said that the testimony shows "that is what those girls were there for." The appellant was not the head of the household, and the purpose of his mother keeping the girls there should not be charged to him, and the court should have admonished the jury to disregard that statement. But in all the circumstances we do not consider this error prejudicial to the substantial rights of appellant. It is also insisted by appellant that the court erred in failing to instruct the jury on voluntary manslaughter and self-defense. The facts in this case do not bring it within the rule requiring an instruction covering all phases of homicide. Instructions must be based upon the evidence and given to suit each particular case. Where the facts and circumstances establish the crime is murder or nothing, although no eyewitness was present, the court is not required to give manslaughter and self-defense instructions. O'Brien v. Com., 89 Ky. 355, 12 S. W. 471; Frasure v. Com., 169 Ky. 620, 185 S. W. 146; Minniard v. Commonwealth, 158 Ky. 210, 164 S. W. 804; Morgan v. Commonwealth, 242 Ky. 116, 45 S. W. (2d) 850. See, also, Effie Payne v. Commonwealth, supra, and cases cited therein.

It is our view that the instructions applicable to this case come within the rule of the cases, supra, and the court did not err in failing to give manslaughter and self-defense instructions; there being no evidence upon which to base such instructions.

Finding no error prejudicial to the substantial rights of appellant, the judgment is affirmed.