## Tucker v. Commonwealth.

February 7, 1947.

Ralph Hurt, Fred Faulkner and Geo. O. Bertram for appellant.

Eldon S. Dummit, Attorney General, H. K. Spear, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

Appellant, Homer T. Tucker, was convicted in the Taylor circuit court of voluntary manslaughter and punished by imprisonment for two years and one day in the penitentiary under an indictment accusing him of murdering H. P. Turner on May 24, 1946, at about 3 P. M. in the yard of a cooperage establishment in the city of Campbellsville, Kentucky.

The substance of all the grounds relied on in appellant's motion for a new trial is, that the evidence was insufficient to support the homicide verdict, and that the court should have sustained his motion for a peremptory instruction of acquittal. The only additional ground contained in the motion was an objection and exception to a statement made by a police officer testifying as a witness for the Commonwealth. The witness was asked whether appellant made any statement to him following the difficulty with the deceased, when he stated that he arrested appellant for being drunk at a public place on the morning after the difficulty, and while in charge of the officer appellant made statements to which we will hereinafter refer. The complaint under this ground is leveled against the statement that the witness arrested appellant and the reason he gave for doing so. The court admonished the jury to "not consider that statement or to permit the same to influence a verdict." But the court overruled the motion to discharge the jury and continue the case. We are not prepared to say that this alleged ground, if indeed an error at all, is sufficient to authorize a reversal of the judgment, and it would appear that counsel for appellant entertained the same opinion, since that ground is abandoned and not argued by them on this appeal, leaving for our consideration only the question of the sufficiency of the evidence to

sustain the conviction of appellant of the crime of homicide.

The evidence is uncontradicted, on two points— even admitted by appellant—that some month or so prior to the instant difficulty he and deceased engaged in some kind of affray in which deceased inflicted a wound to one of appellant's arms by gashing it with a knife which impaired that member to some extent and produced a permanent scar. From that time forward appellant was much embittered and angered toward the deceased. The second admitted and undisputed fact is that deceased, who was 67 years of age, had for some time past been afflicted with the hardening of the arteries, or some other ailment, that impaired his power of locomotion and, perhaps, the normal use of other members of his body to the extent that he could neither walk straight, nor at all times without the assistance of a cane.

Floyd Dickens, a witness for the Commonwealth, and an employee of the cooperage company, stated that he first saw the deceased sitting alone on one of the three saw logs which were laying parallel and adjacent to each other, and that when witness made a circuit around a stack of staves, and when within about 50 yards from where he first saw deceased, he (deceased) and appellant were engaged in a difficulty with deceased lying on his back across the three logs and appellant on top of him. Witness then went immediately to the scene. In giving his testimony he said: "I run to them as quick as I could get there and told them to stop and they did. Homer (appellant) just held him there the way he had him when I first saw him. I told him to get up. He said, 'Well, take Pert's knife away from him.' I said, 'You drop your knife,' and Claywell was there and I told Claywell to take Pert's knife away from him." (Our parenthesis.) The witness then stated that when he arrived at the spot deceased had been cut over one of his eyes with a knife and that he had to pull appellant off of deceased, he (deceased) being unable to raise himself from the logs upon which he had been knocked by appellant. Witness was then asked: "Q. What was said or done after you got these men apart?" to which he answered: "Well, I told Mr. Tucker to quit and go down the road, the police will be looking for you. He said something about he just wanted to pay him back

for what he done to me once before. That is all he said. * * * Mr. Turner, we got him up. I led him down the road 50 or 60 yards. I met a fellow and told him to take him to a doctor.''

Witness later stated that decedent after being lifted from the logs was unable to walk alone and that ''there was blood over his face and eyes. I don't think he could have made it.'' Witness turned decedent over to another who assisted him in reaching the office of Dr. E. L. Gowdy who testified for the appellant and whose testimony will be hereinafter referred to. Dickens also testified that after he arrived at the scene appellant struck decedent two blows while each were in the position heretofore described.

The witness for the Commonwealth, Claywell, corroborated his fellow workman, Dickens, and he also testified that: ''* * * while we was trying to get them away from each other, Homer said he ought to kill the G—— d—— son of a b—— while he had him down.''

Joe Allen, a policeman in Campbellsville, testified, as we have hereinbefore stated, that he arrested appellant the morning after the difficulty in the afternoon of the previous day and that while in his custody witness stated, on being asked concerning any statement made by appellant to him: ''He made the statement—he asked me if I had heard what happened yesterday. I said no. He said I did something yesterday he had been waiting to do for a long time. He went on ahead and told me about it, and said he tried to cut the old son of a b—— head off. We kept walking. There was a little scratch on his nose, and a little hole in his shirt and he said it was done with a knife.''

A. A. Cox, another Commonwealth witness, testified that he saw appellant about five minutes after his difficulty with deceased, and that he then stated that: ''he done what he'd been aiming to do for a long time, and if it hadn't been for that red-headed guy, he would (not) have been carrying some of these things he was carrying.''

Dr. Gowdy was very busy when decedent was brought to his office and he made but a slight investigation as to his wound resulting in his administering to

him only treatment of the severe knife wound in his cheek by suturing it with several stitches and that deceased was then conveyed to his home and died some 48 hours thereafter.

The Commonwealth introduced Dr. M. M. Hall who visited decedent at his residence the next morning. Witness had not heard of the difficulty and he found decedent in an unconscious condition and learned from his attendant that he had been in that condition since about midnight before, which the doctor described as ''in the process of dying.'' On being asked what evidences of wounds witness found, he stated that deceased had a deep cut through his cheek which had been sutured; that he had ''a knot swollen out on his forehead on the right side, with a lot of bleeding down around the eye,'' which was very bloody and red, and the same was true as to the whole of that side of his face. Witness stated that he again saw decedent the next morning and that he was ''gradually getting weaker, pulse faster and in the process of dying both times I saw him.'' On being asked to what he attributed decedent's condition witness answered: ''Well, Mr. Turner was a fellow of some age. He had gotten up to the point where he was a little feeble about getting around and of course had senility. I think that his accident hurried him on. He didn't have too much time to live anyway. I think this accident hurried him on.''

Witness was asked by counsel whether a lick on decedent's head—coupled with some other hypothetical questions based on what witness had testified to as to decedent's condition—was calculated to produce hemorrhage on the brain or blood clot thereon, as the witness had diagnosed the case to be; but the court sustained defendant's objection thereto and no avowal was made. However, witness did state that decedent's condition, as described by him, could have produced and brought about his dying condition that witness discovered, and that it was very probable that such wounds accelerated the physical ailment of decedent from which a hemorrhage or blood clot on the brain would be produced. Dr. Gowdy, who was introduced by defendant, gave like testimony, but he never saw decedent after the latter left his office, as hereinbefore stated.

Appellant in testifying on his own behalf stated that he and decedent met at the place where the difficulty occurred and that when they were about 10 feet apart decedent said: "I want to make friends with you." He (appellant) then said: "I said make friends with you; I had rather make friends with a sheep killing dog than you. About that time he was punching at me with the cane and struck me on the shoulder with a knife and cut two places through my shirt. I grabbed his arm and hit him and knocked him back on the logs." No one corroborates him on his statement that the decedent punched him with his cane or struck him on the shoulder with his knife, although in the scuffle he did sustain a slight wound. He nowhere denied the angry remarks against decedent to which the prosecuting witnesses testified.

The evidence therefore uncontradictedly shows—and which is admitted by appellant—that he entertained malice and unquenchable anger toward decedent, and that he inflicted wounds upon his victim, which supplies two elements of punishable homicide, leaving only for our determination the only argued question in his counsel's brief which is whether or not the inflicted wounds on decedent's body proximately produced his subsequent death, or accelerated the immediate cause of his death and without which his life would have been prolonged. We have already seen from the testimony of Dr. Hall, partially substantiated by Dr. Gowdy, that the wounds inflicted by appellant upon his victim in his then failing physical condition (of which appellant had knowledge) would most likely hasten decedent's death. The jury was properly instructed on that phase of the case, and we think the evidence sufficient to sustain its verdict.

At common law the rule was that: "to constitute a culpable homicide the cause of death must have been corporal, not nervous or emotional, and it has been said in modern decisions that if a person, by stimulating the imagination of another, or by ill-usage, puts him in such an intense emotional state of grief, fear, or the like, that death results, the killing is not by the law a foundation of criminal responsibility." 26 Am. Jur., page 190, Sec. 47. But the same section states that even that rule has been relaxed in modern times so as "that death caused or accomplished through fright, fear, terror, or nervous

shock may form a foundation for criminal responsibility." The citations in the notes to that section completely sustain the text. However, if we should discard the rule of criminal responsibility for death produced by any such causes, the same authority in its next section, 48, page 191, says:

"Liability for homicide does not depend upon the fact that death is the immediate consequence of the injury inflicted by the accused. One who inflicts an injury on another is deemed by the law to be guilty of homicide if the injury contributes mediately or immediately to the death of such other. The fact that other causes contribute to the death does not relieve the actor of responsibility provided such other causes are not the proximate cause of the death. Criminal responsibility for inflicting an injury which is the efficient cause of death is not lessened merely because of the predisposed physical condition of the decedent, without which the blow or wound would not have been fatal."

The doctrine of the last inserted excerpt is approved by this court in the case of Hopkins v. Com., 117 Ky. 941, 80 S. W. 156, 4 Ann. Cas. 957. Compare also Com. v. Owens and Evans, 198 Ky. 655, 249 S. W. 792, and Payne v. Com., 255 Ky. 533, 75 S. W. 2d 14. The same principle is stated in section 279 of Roberson's New Kentucky Criminal Law and Procedure in which the learned author says: "The act of the defendant need not have been the sole cause of the death, to render him criminally liable therefor. It is sufficient if the act contributed to the death or accelerated it."

The case of Com. v. Couch, 106 S. W. 830, 32 Ky. Law Rep. 638, 16 L. R. A., N. S., 327, cited and relied on by appellant's counsel, is not in point, since the alleged criminal act of the accused in that prosecution was neither the proximate nor remote cause of the death of his alleged victim upon whose body the accused inflicted no corporal punishment. A reading of the opinion therein and other cases cited by the court therein will clearly show the inapplicability of the principle therein decided, to the facts of this case. The other cases relied on by counsel for appellant simply declare that bare suspicion and conjecture will not sustain a conviction for crime; but, as we have previously stated, the testimony in this

case, as we conclude, was sufficient to submit to the jury the question of appellant's guilt under the testimony adduced at the trial, and to sustain its verdict of guilty, showing that its members determined that appellant's assault upon his victim, and the punishment he inflicted upon him, proximately produced or accelerated decedent's death.

Wherefore, for the reasons stated, the judgment is affirmed.